**In re PFIZER INC. SECURITIES LITIGATION.**

No. 04 Civ. 9866 (LTS) (HBP).

United States District Court,
S.D. New York.

Jan. 8, 2013.

---

*OPINION AND ORDER*

PITMAN, United States Magistrate Judge.

## I. *Introduction*

By notice of motion dated August 28, 2012 (Docket [1] Item 425), lead plaintiff Teachers' Retirement System of Louisiana ("TRSL") and plaintiffs Christine Fleckles, Julie Perusse and Alden Chase (collectively, with TRSL, "Plaintiffs") move for sanctions, including an adverse-inference jury instruction, against defendant Pfizer, Inc. ("Pfizer") based on Pfizer's alleged spoliation of evidence and delayed production of documents. By a motion also dated August 28, 2012 (Docket Item 422), Pfizer and the individual defendants Henry McKinnell, Karen Katen, John LaMattina, Joseph Feczko and Gail Cawkwell move for sanctions and for an adverse-inference jury instruction against TRSL based on its alleged spoliation of evidence and against Plaintiffs for their failure to preserve certain expert discovery materials and for their allegedly improper and misleading use of statements of former Pharmacia employees in the Consolidated Class Action Complaint.

For the following reasons, both Plaintiffs' and Pfizer's motions are denied in their entirety.

## II. *Facts*

This action was commenced on December 15, 2004 (Docket Item 1). Plaintiffs claim that Pfizer violated the federal securities laws when it allegedly made fraudulent, material misrepresentations and fraudulently omitted to state facts concerning the cardiovascular safety of two of its COX–2 family of

---

1. Unless otherwise stated, all references to the "Docket" are to *In re Pfizer Securities Litigation,* 04 Civ. 9866(LTS)(HBP) (S.D.N.Y.).

pain-relieving drugs, Celebrex and Bextra, and that, as a result, Plaintiffs suffered losses in connection with their purchase of Pfizer stock (Docket Item 361 ¶ 1) between October 31, 2000 through October 19, 2005 (the "Class Period").

### A. Pertinent Facts Related to Plaintiffs' Motion for Sanctions

Prior to the commencement of this action, Pfizer and Pharmacia [2] were parties to other lawsuits related to Celebrex and Bextra. In 2001, Pfizer was a party in a patent dispute with Brigham Young University over the identification of the COX-2 enzyme that led to the development of Celebrex and Bextra (Docket Item 427, Declaration of Mary S. Thomas, Esq. in Support of Plaintiffs' Motion for Spoliation and Other Sanctions Against Defendant Pfizer Inc. ("Thomas Decl.") ¶ 5, Ex. 1). In 2003, Pharmacia, which Pfizer acquired in 2003, was sued in New Jersey federal court for securities fraud arising out of allegedly false and misleading statements concerning the gastrointestinal safety of Celebrex (*see Alaska Electrical Pension Fund v. Pharmacia Corp.*, No. 03 Civ. 1519 (D.N.J.); Thomas Decl. ¶ 7). As early as 2004, Pfizer was involved in several *qui tam* actions under the False Claims Acts and a federal criminal investigation regarding the off-label promotion and sale of Bextra (Thomas Decl. ¶ 8). By 2005, Pfizer had also been sued in numerous products liability actions relating to Celebrex and Bextra (Thomas Decl. ¶ 6). As a result of these lawsuits, Pharmacia had litigation holds related to Celebrex in place as early as May 2001 (Thomas Decl. Exs. 5–6). Pfizer had litigation holds in place related to its COX-2 drugs, including Celebrex and Bextra, dating back to 2001 (Thomas Decl. Ex. 3 at 50:18–23).

The first complaint in this action was filed on December 15, 2004 and a second complaint was filed two days later (Docket Item 431, Declaration of John R. Wellschlager, Esq. in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Spoliation and Other Sanctions Against Defendant Pfizer, Inc. ("Wellschlager Decl.") Exs. 1–2). On December 17, 2004, Pfizer

issued a litigation hold notice to its employees directing them to preserve all documents related to Celebrex and Bextra (Wellschlager Decl. Ex. 3). Pursuant to this hold, Pfizer followed "a preserve in place policy where the colleague who receives the hold is obligated to assure [his or her documents'] preservation" (Thomas Decl. Ex. 3 at 43:16–19). As an example, for custodial files, the relevant custodians would create a subfolder on either their computer hard drives or on Pfizer's server and then "whatever documents they believe[d] [were] relevant would be put into a subfolder" (Thomas Decl. Ex. 3 at 44:2–15). With respect to documents that were not associated with a particular custodian, Pfizer's policy was to hold these documents separately in a "structured database" (Thomas Decl. Ex. 3 at 45:6–23).

#### 1. eRooms

Discovery began in this action in late 2008. Plaintiffs served Pfizer with document requests that sought, *inter alia*, documents associated with the clinical trials of Celebrex and Bextra (Thomas Decl. Ex. 10). The requests delineated specific categories for each study (Thomas Decl. Ex. 10). For example, Plaintiffs requested:

2. For the Alzheimer's 1999 study (001), all:

a) Data Safety Monitoring Committee ("DSMC") minutes;

b) presentations by Pfizer, G.D. Searle & Co., and/or Pharmacia, or any agent or representative of the same (collectively, the "Company") to the DSMC;

c) reports on any data prepared by the Company for the DSMC;

d) correspondence between the Company and the DSMC;

e) custodial files of any Company employees that corresponded or interacted with the DSMC;

f) custodial files of any clinical monitors involved in the study;

g) custodial files of any medical monitors involved in the study;

---

**2.** Pharmacia was Pfizer's marketing and sales partner with respect to Celebrex and Bextra.

h) custodial files of any statisticians involved with statistical work for the DSMC or the trial itself; and

i) minutes of any study committee meeting, including, but not limited to, the steering committee and executive committee.

(Thomas Decl. Ex. 10 at 2). Pfizer informed Plaintiffs that it "has never maintained documents organized according to many of the categories you have listed" and advised that "such documents would be found, to the extent they exist, in the custodial files of the Pfizer employees involved" in the particular study requested (Thomas Decl. Ex. 7 at 1; Ex. 8 at 1).

Accordingly, the parties proceeded with the production of documents from the files of the relevant custodians (Thomas Decl. ¶ 14). Pfizer produced relevant emails, letters, study reports, press releases, organizational documents and other documents from the electronic files of 94 custodians (Wellschlager Decl. ¶ 73(a)). Pfizer also produced the legacy files from Pharmacia, Monsanto and Searle, documents from its regulatory files, documents from the Trial Master Files, clinical study materials, expert discovery from other COX–2 related litigations and documents that had been provided to various regulators (Wellschlager Decl. ¶ 73(b)-(g)). This production amounted to approximately 40 million pages of documents. In addition, Pfizer responded to Plaintiffs' other discovery requests, including interrogatories, requests for admissions, expert discovery and fact witness depositions (Wellschlager Decl. ¶¶ 74–75).

In 2010, after reviewing the deposition transcript of a former Pfizer employee taken in a different case related to Celebrex and Bextra, Plaintiffs discovered a reference to an "eRoom" that had been maintained by Pfizer (Thomas Decl. ¶ 14). An eRoom, as described in one Pfizer-produced document, was a "collaborative application" for Pfizer employees to "share documents, share calendars, archive email, conduct discussions/instant messaging, and to conduct informal polls" (Thomas Decl. Ex. 25 at Cardon–V 10000333648). Accordingly, on December 21, 2010, Plaintiffs served a document request on Pfizer that specifically sought "all documents concerning Bextra or Celebrex, sent to or maintained in the 'e-room' for safety materials, as described by Winifred M. Begley, in her September 6–8, 2006 deposition" (Thomas Decl. Ex. 24 at 10, Request 24). Pfizer objected to this request on various grounds, including that it was "premised upon faulty or incorrect factual predicates" (Thomas Decl. Ex. 28 at 26).

After a March 31, 2011 meet and confer, Pfizer's counsel agreed to look into the existence of eRooms, as well as any other centralized databases that Pfizer maintained (Thomas Decl. ¶ 21). Plaintiffs provided Pfizer with a list of references to eRooms that they had discovered in their review of Pfizer's document production (Thomas Decl. Ex. 29). Pfizer responded that it had decommissioned the use of eRooms, but that it was working toward locating the specific material Plaintiffs had requested and any potentially archived data (Thomas Decl. Ex. 32 at 1).

In order to further explore the nature and extent of Pfizer's use of eRooms, Plaintiffs noticed a deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and, at Pfizer's request, submitted some of the Rule 30(b)(6) topics as interrogatories (Thomas Decl. ¶ 27). Jack Wish, who was responsible for the management of Pfizer's eRooms from 2003 to 2005, certified that the interrogatory responses "were based upon Pfizer's knowledge, information and belief" and that "they were true to the best of my knowledge, information and belief" (Thomas Decl. Ex. 40 at 20). In addition, Pfizer produced four witnesses who testified regarding discovery-related issues, including the eRooms (Wellschlager Decl. ¶ 75).

In its interrogatory responses, Pfizer represented that it had archived its eRooms in 2011 (Thomas Decl. Ex. 40 at 5). During the archiving process, Pfizer first locked the eRooms to prevent the addition or deletion of any information, and then saved the contents of the locked eRooms to a zip file that was maintained by Pfizer IT personnel (Thomas Decl. Ex. 40 at 6). Thus, when the archived eRooms were restored for production in this action, they contained only those documents and metadata that existed in them at the

time of their archiving (Thomas Decl. Ex. 40 at 15; *see also* Wellschlager Decl. Ex. 24 at 26:3–4) (Mr. Wellschlager: "[T]he e-rooms exist in the form that they were ultimately archived . . . .").

Pfizer explained in its interrogatory responses that documents shared in an eRoom were usually created outside of the eRoom in a native computer application—like Microsoft Word—and then posted in the eRoom by the user (Thomas Decl. Ex. 40 at 16). Mr. Wish testified that even when a document was created using a feature of the eRoom software that allowed a user to create a document directly in the eRoom, that file would be saved both on the user's local computer and in the eRoom (Wellschlager Decl. Ex. 6 at 173:13–175:5). Accordingly, regardless of whether the document was created using the eRoom software or another computer application, any documents posted in an eRoom would be saved on both the individual user's computer and in the eRoom (*see* Thomas Decl. Ex. 40 at 16 ("[T]he contents of an eRoom are usually duplicative of information that can be found elsewhere.")).

Documents contained in the eRooms contained various types of metadata (Thomas Decl. Ex. 40 at 8). This included application metadata, which was generated by the particular computer application, *i.e.*, Microsoft Word, that created the document and recorded "when a document was created or modified, the individual who last modified the document, and/or the total number of times the document was revised" (Thomas Decl. Ex. 40 at 9). The eRoom software also created its own application metadata, which recorded information such as the item's name, type, URL location, ID number, path, creation date within the eRoom, modification date within the eRoom (to the extent this was available), access information, creator name and role (*e.g.*, coordinator or participant[3]) and size (Thomas Decl. Ex. 40 at 9–10). The eRooms that were restored in this action retained whatever application metadata they had when the particular eRoom was archived (Thomas Decl. Ex. 40 at 9).

The eRoom software could also generate system metadata for documents (Thomas Decl. Ex. 40 at 10). System metadata, as explained in Pfizer's interrogatory responses, included "information about eRoom groups, members roles, and member identities/attributes" (Thomas Decl. Ex. 40 at 10). It could also "track when a file was created within the eRoom and by whom" (Thomas Decl. Ex. 40 at 12). The system metadata, however, did not automatically track every time a user made an edit unless this option was affirmatively selected by a user (Thomas Decl. Ex. 40 at 12–13).

The eRoom software also had a function that enabled the system metadata to record eRoom usage information (Thomas Decl. Ex. 40 at 10). This usage information was stored in a facility eRoom and recorded information such as "total member count, last member login time, size of the eRoom, and total count of items" (Thomas Decl. Ex. 40 at 14; Ex. 41 at 236:13–15 (Mr. Wish: testifying that "the facility reports in one section would provide when a person last logged into a room")). The usage information was "used by administrative personnel to help manage Pfizer's IT licensing agreements and the operation of Pfizer's servers" (Thomas Decl. Ex. 40 at 10; Ex. 14 at 236:5–8 (MR. WISH "[e]-Room usage reports were reports that were inside of a facility E–Room and they would show us volumetrics about E–Room to help us maintain the infrastructure")). The eRoom software "permit[ed] the inspection of certain metadata in a usage report which remain[ed] in the eRoom for up to one year" (Thomas Decl. Ex. 40 at 10).

The usage reports stored in the facility eRoom, however, did "not show what documents or folders or other substantive information the users may have created, deleted, edited or posted" (Thomas Decl. Ex. 40 at 14). In addition, they "could not report whether a document was merely viewed or

---

**3.** An eRoom coordinator generally had the broadest access rights, including the ability to edit the name of an eRoom or its folders or to add or delete files within the eRoom. A coordinator was also "most often responsible for tailor-

ing the eRoom to the needs of a particular team and adjusting them as necessary" (Thomas Decl. Ex. 40 at 18). In contrast, a participant could only add or delete material that he or she "owned" (Thomas Decl. Ex. 40 at 18).

by whom it was viewed" (Thomas Decl. Ex. 40 at 18).

Pfizer's eRooms also created security logs. Nicholas Brewer, who was responsible for Pfizer's eRooms from 2006–2010, testified that he believed the eRoom software could track end-users' access to eRoom documents (Thomas Decl. Ex. 89 at 28:13–16). When asked how this was done, he testified "I would assume through security logs or versioning history. If I recall, I think it was either metadata or something, metadata or metafile or something like that, that either tracked user access or version history . . . ." (Thomas Decl. Ex. 89 at 28:18–22). He described security logs as "some sort of log that says this user ID logged in at this time, this user ID logged off at that time" and that these logs would have been kept as a text file on a server (Thomas Decl. Ex. 89 at 29:3–11). At a conference before me, Pfizer's counsel explained that "it appears that while we may have access to information about who could have availed themselves of an e-room, a server log would show if they in fact did and how often they did even if it doesn't show what was looked at" (Thomas Decl. Ex. 47 at 44:20–24; *see also* Ex. 47 at 28:2–9). Given Mr. Brewer's description and Pfizer's counsel description, it appears that security and server logs are identical.

The eRoom software could also create membership lists that would reflect the current members of an eRoom, but would not identify former members (*see* Thomas Decl. Ex. 40 at 18).

Pursuant to a protective order, Pfizer agreed to allow Plaintiffs to inspect and copy documents from the eRooms that Pfizer had restored for production without Pfizer first conducting a privilege or responsiveness review (Wellschlager Decl. Ex. 34). Of the 164 eRooms Plaintiffs identified (Thomas Decl. Ex. 108), Pfizer restored 46 eRooms and made available the source data for another 14 eRooms that had been transferred to a different software platform (Wellschlager Decl. ¶ 73(h)). This production totaled approximately 10 gigabytes of data (Wellschlager Decl. ¶ 73(h)). With respect to the remainder of the eRooms identified, Pfizer has stated that these eRooms were either duplica-

tive, were subfolders contained in already-restored eRooms, did not contain any substantive data or on their face did not contain any relevant documents (Thomas Decl. Ex. 54; Wellschlager Decl. App. B). For those eRooms that contained only a link to another eRoom, Pfizer restored that linked eRoom (Wellschlager Decl. App. B).

The restored eRooms "containe[d] the same site setting, user information, and access rights as the original eRooms" (Thomas Decl. Ex. 40 at 11). The eRooms, however, reflected that information only as it existed when the particular eRoom was archived (Thomas Decl. Ex. 40 at 15). The restored eRooms also contained membership lists that could be generated by the eRoom software and were accessible from within the eRoom itself (Docket Item 432, Supplemental Declaration of Mary S. Thomas, Esq. ("Thomas Supp. Decl.") ¶ 2). These lists reflected the members at the time the eRoom was archived, but did not include former members (Thomas Decl. Ex. 40 at 15).

### 2. *Centralized Databases*

During the course of the parties' eRoom discussion, it was also discovered that Pfizer had not searched certain electronic databases for responsive documents. The first, the GDMS database, contained relevant historical documents and was organized by chemical compound number, which meant that Celebrex documents would be segregated from Bextra documents (*see* Wellschlager Decl. Ex. 70 ¶ 20 ("[The GDMS] is an electronic document management system used by Pfizer's Research & Development and Medical units to house regulatory practices, guidelines, documents, and submission components.")). The second, the DLTS database, contained legacy Pharmacia documents and documents provided to Pfizer's in-house legal department in response to litigation holds (Thomas Decl. ¶ 33, Ex. 49 at 4; Wellschlager Decl. Ex. 70 ¶ 24 ("[The DLTS] database is an electronic management system that houses documents which no longer support current business activities, yet have been retained for regulatory, legal or other purposes.")). The final database—Infoshare/Insight—contained meeting minutes, protocols, study reports, timelines, archives and gover-

nance and regulatory information (Thomas Decl. Ex. 84). Pfizer initially stated that it had not searched these databases because it believed they contained duplicative documents, but later agreed to search for and produce documents from these databases (Thomas Decl. Ex. 3a at 19–20). I ordered the parties to meet and confer on appropriate search terms and for Pfizer to "de-duplicate" any subsequent productions (Thomas Decl. Ex. 3a at 30–33).

During an April 18, 2012 discovery conference, I ordered Pfizer to (1) produce the metadata search results from the GDMS and DLTS databases by April 25, 2012 and (2) complete production from the databases on a rolling basis within 50 days (Thomas Decl. Ex. 52). Pursuant to a protective order, Pfizer agreed to produce documents without first conducting a privilege or responsiveness review. Pfizer completed its production from the databases on June 12, 2012, which was after the close of discovery. This production totaled over 21 million pages (Wellschlager Decl. Ex. 70 ¶ 27). Plaintiffs contend that this production contains relevant and non-duplicative emails that should have been produced earlier on in discovery (Thomas Decl. ¶ 36).

### B. Pertinent Facts Underlying Pfizer's Motion for Sanctions

Pfizer's motion for sanctions is based on three separate issues. The pertinent facts are set forth below.

#### 1. TRSL's Document Preservation

Between June 30, 2000, and June 30, 2004, TRSL increased its investment in Pfizer from approximately $15.1 million to $77.6 million (Docket Item 436, Declaration of George S. Wang, Esq. in Support of Defendants' Memorandum of Law in Support of Defendants' Motion for Sanctions ("Wang Decl.") Ex. 18 at TRSL 0000540; Ex. 19 at TRSL 0000976). TRSL was appointed as lead plaintiff in this action on October 21, 2005 (Docket No. 43).

Pfizer noticed a Rule 30(b)(6) deposition to explore the scope of TRSL's document preservation efforts. TRSL, like other pension

funds, relies on outside money managers and investment advisors to make its investment decisions. For example, William Reeves, TRSL's now-retired general counsel, testified at a Rule 30(b)(6) deposition that "TRSL made no investment decisions at all" (Wang Decl. Ex. 20 at 64:4–5). Similarly, TRSL's Chief Investment Officer Phillip Griffith testified at a Rule 30(b)(6) deposition that TRSL "hire[s] managers to run the assets or to invest the assets for us" and that TRSL does not "actually make the investment decisions or influence the investment managers that we hire on what to buy or sell. It's completely their decision and it's contractually documented" (Docket Item 435, Declaration of Mary S. Thomas, Esq., dated September 25, 2012 ("Thomas Opp. Decl.") Ex. G at 82:4–5, 11–15).

Pursuant to a Louisiana state statute,[4] TRSL is required to retain permanently records relating to its investment transactions, but only is required to retain general correspondence for one year (Wang Decl. Ex. 54). Mr. Griffith testified that TRSL permanently retains the trading history of its investments on CD–ROMs and checks and cash flow on tapes or discs in its office (Wang Decl. Ex. 33 at 100:4–7). This material is also permanently retained with a custodian and on a disaster recovery server (Wang Decl. Ex. 33 at 100:10–20). With respect to emails, Mr. Griffith testified that, after discussing the matter with TRSL's information technology staff, TRSL determined that emails fell under the category of general correspondence and were, therefore, retained for one calendar year and then destroyed (Wang Decl. Ex. 34 at 100:20–102:5; Ex. 54).

When asked whether TRSL had issued a litigation hold, Mr. Griffith testified that he could not point to "a specific action" that TRSL put in place to preserve documents related to Pfizer and that he was not familiar with any TRSL preservation notice related to the Pfizer litigation (Wang Decl. Ex. 33 at 49:7–22). Mr. Griffith, however, also testified that "there was a general understanding to retain any documents associated with any litigation" (Wang Decl. Ex. 33 at 49:13–15).

---

4. The parties have not identified this statute.

Mr. Reeves testified that he did not implement a litigation hold or circulate a document preservation notice (Wang Decl. Ex. 20 at 52:3–12) and that he did not discuss with outside counsel whether TRSL needed to preserve documents related to this action (Wang Decl. Ex. 20 at 52:13–53:4).

With respect to TRSL's retention policy for emails, Bobby Aymond, TRSL's information technology head, testified at a Rule 30(b)(6) deposition that TRSL maintains backup tapes of its emails for one year (Wang Decl. Ex. 37 at 26:7–15). When asked whether TRSL ever communicated with its outside advisors about transactions involving Pfizer through email, Mr. Reeves could not definitively state that there were no such communications (*e.g.*, Wang Decl. Ex. 20 at 124:14–19). However, he also testified that he was not aware of the existence of any emails among TRSL staff concerning investments (Wang Decl. Ex. 20 at 39:6–13). He further testified that a litigation hold was not necessary to ensure that TRSL's staff preserved documents related to this action because, to his knowledge, "there were no other documents than whatever I reiterated before because TRSL made no investment decisions at all" (Wang. Decl. Ex. 20 at 64:2–5). Plaintiffs' counsel also informed me at a discovery conference held on July 28, 2011 that "TRSL began archiving documents back in 2007, but the fact is that other than trading records, there are no responsive documents that ever existed" because TRSL "essentially delegate[s] to outside investment advisors the authority to buy and sell stock" (Thomas Decl. Ex. 33 at 7:24–8:5).

Pfizer has cited testimony and several documents that it contends establish that TRSL did discuss its specific investments both internally and with third parties:

1. In a deposition taken in the Tyco securities litigation, a TRSL representative testified that TRSL's investment committee would sometimes discuss a specific investment (Wang Decl. Ex. 34 at 41:1–13, 17–20) ("Q: Could [the discussion of a specific investment] come up with respect to publicly traded entities? A: Occasionally a comment would be asked of the manager who's in for the detailed review about a security in their portfolio.").

2. UBS Warburg, one of TRSL's outside investment advisors, emailed TRSL a research analysis of a security (Wang Decl. Ex. 35). Mr. Griffith testified that this information was likely requested after TRSL had already received the investment (Thomas Opp. Decl. Ex. G at 154:5–156:8).

3. When asked about specific emails that had been sent by TRSL's investment managers to TRSL concerning the execution of certain trades, Mr. Griffith explained that due to a former Louisiana statute, La.Rev. Stat. Ann. § 266.1, TRSL was required to use Louisiana brokers to execute a certain percentage of its trades (Thomas Opp. Decl. Ex. G at 127:3–9). To comply with this statute, TRSL would communicate its outside advisors' trading decisions to Louisiana brokers who would then execute the trades (Thomas Opp. Decl. Ex. G at 127:10–129:22). Mr. Griffith further testified that "the decisions to purchase the stocks and the dollar amounts and the time frames were all specified by the money manager" (Thomas Opp. Decl. Ex. G at 127:21–23).

4. Pfizer points to a Goldman Sachs document that contained an analysis of the strength of Pfizer's stock and that noted that "Pfizer, Inc.'s stock was under pressure due to concerns over new data suggesting an increased cardiac risk linked to its COX–2 inhibitors, Celebrex and Bextra" but that "[b]ased on Pfizer's favorable long-term prospects, strong competitive position, robust free cash flow generation and attractive valuation, we have decided to maintain our position" (Wang Decl. Ex. 36 at GSAM000070). However, Goldman Sachs has indicated that this document "'may or may not have been sent to [TRSL]'" (Thomas Opp. Decl. Ex. T at 29 n. 9 (alterations in original)).

### 2. *Expert Discovery Material*

As one of their experts, Plaintiffs hired Dr. David Madigan, a statistician, to conduct a meta-analysis of adverse events, *i.e.*, deaths, that had occurred during Pfizer's clinical trials of Celebrex, and to determine whether

there was a statistically significant increased cardiovascular risk associated with Celebrex (Wang Decl. Ex. 1 at 1).

In 2008, Dr. Madigan had previously performed a meta-analysis of this clinical trial data in connection with a personal injury suit related to Celebrex (Wang Decl. Ex. 3). Dr. Madigan received the raw data from Pfizer. Dr. Madigan defined three statistical categories under which to classify the adverse events (Wang Decl. Ex. 1 at 4–5; Ex. 2 at 53:5–23). These categories represented different types of cardiovascular events (Wang Decl. Ex. 1 at 4). The clinical trial data described the cause of the adverse events using standardized medical terms. In connection with the personal injury action, Dr. Madigan asked Dr. Baruch, a cardiologist, to classify each death under one of the three defined categories (Wang Decl. Ex. 2 at 55:9–15; Ex. 3 at 39:23–41:5; Thomas Opp. Decl. Ex. M at 78:12–79:12). To record his classifications, Dr. Madigan provided Dr. Baruch with a spreadsheet that listed the study number, patient identification number and the description of the cause of death (Wang Decl. Ex. 3 at 40:15–25; Ex. 5 at 87:16–89:2). In order to classify some of the deaths, Dr. Baruch asked Dr. Madigan for the underlying adverse event files (Wang Decl. Ex. 5 at 135:17–137:20). Dr. Baruch reported his findings by returning the spreadsheet with his classifications to Dr. Madigan (Wang Decl. Ex. 5 at 88:11–89:2; 135:21–25). Dr. Baruch did not keep any of the files that he created in classifying the deaths and did not recall for which deaths he had requested the underlying adverse event files (Wang Decl. Ex. 5 at 14:11–15:14; 135:17–136:22; 145:3–14; 148:5–149:8). Pfizer, however, has a copy of Dr. Baruch's 2008 classification spreadsheet (Wang Decl. Ex. 7 at 391:10–392:14; *see also* Thomas Opp. Decl. ¶ 2).

In this action, at Plaintiffs' counsel request, Dr. Curt Furberg, another medical doctor, subsequently reviewed Dr. Baruch's spreadsheet (Wang Decl. Ex. 7 at 365:4–366:3). Dr. Furberg made handwritten revisions to the chart indicating any disagreements (Wang Decl. Ex. 7 at 384:10–21). There is a dispute about how these revisions were communicated to Plaintiffs' counsel and incorporated into the final spreadsheet that was provided to Dr. Madigan to use in conducting his meta-analysis. At his deposition, Dr. Furberg testified that his handwritten notes were "probably faxed" to Plaintiffs' counsel (Wang Decl. Ex. 7 at 384:22–25; 385:7–15). However, Mr. Jarvis, one of Plaintiffs' attorneys, submitted an affidavit in connection with this motion that states that Dr. Furberg verbally relayed the results to him, and that Mr. Jarvis then inputted the changes into the electronic version of the spreadsheet (Docket Item 434, Declaration of Geoffrey C. Jarvis, Esq. in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Sanctions ("Jarvis Decl.") ¶ 6). Mr. Jarvis attested that he never received a copy of the spreadsheet with Dr. Furberg's handwritten revisions (Jarvis Decl. ¶ 8). Regardless of the mode of transmission, the spreadsheet with Dr. Furberg's handwritten revisions was not produced in discovery. However, the final version of the spreadsheet, which incorporated Dr. Furberg's changes to Dr. Baruch's 2008 classifications, was produced to Pfizer at Dr. Madigan's June 11, 2009 deposition (Jarvis Decl. ¶ 7). From this final spreadsheet, it was not possible to discern which classifications Dr. Furberg changed (*see* Jarvis Decl. ¶ 7; Wang Decl. Ex. 5 at 150:21–152:23) (Dr. Baruch testifying that his knowledge of Dr. Furberg's changes came from Plaintiffs' counsel).

In completing his statistical analysis, Dr. Madigan testified that he relied on the classifications that were contained in the final version of the spreadsheet (Wang Decl. Ex. 2 at 96:4–97:24; Docket Item 437, Reply Declaration of Patrick T. Shilling, Esq. to Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Sanctions ("Shilling Decl.") Ex. 58 at 148:9–150:24). Dr. Madigan's March 12, 2009 expert report concluded that Celebrex was associated with a statistically significant increase of cardiovascular events (Wang Decl. Ex. 1 at 14).

In October 2009, Dr. Madigan updated his expert report to incorporate Pfizer's 2005 classifications of the adverse events in its clinical trial data and to include four addi-

tional deaths (Thomas Opp. Decl. Ex. L ¶ 8). With respect to the Hard CHD [5] category, one of the categories Dr. Madigan had previously defined, Dr. Madigan updated his analysis to include the four additional deaths; he also relied on classification work per-formed by Dr. Furberg and Dr. Baruch with respect to these deaths (Thomas Opp. Decl. Ex. L at ¶ 12; Ex. M at 79:13–80:10). Dr. Madigan confirmed the foregoing at his deposition (Thomas Opp. Decl. Ex. M at 79:13–25; 237:19–239:12; 240:4–14).

At his deposition, Dr. Madigan testified that he agreed that the classifications of the deaths were an important part of his analysis and affected the outcome of his analysis (Wang Decl. Ex. 2 at 59:21–61:8). Dr. Madigan testified at the *Daubert* hearing held in 2009 that it was "reasonable" that to the extent that Dr. Baruch's classification process was flawed, his own process and analysis would be flawed (Wang Decl. Ex. 11 at 554:14–23). Dr. Madigan's testimony, however, primarily focused on how the final classifications impacted his analysis, and not on the process underlying them.

3. *Statements from Former Pharmacia Employees in the Consolidated Class Action Complaint*

In preparing the Consolidated Class Action Complaint ("CCAC"),[6] in or about January 2006, Plaintiffs hired an investigative firm, Granite Intelligence, to research Pfizer and related matters. Granite Intelligence's investigators contacted four former Pharmacia employees, Dr. John Talley, Paul Dodson, Krista Fox and Andrew Watson (collectively, the "Quoted Former Employees"), and informed each that they were "conducting research into Pfizer, Inc., on behalf of Grant & Eisenhofer, P.A., who in turn is working on behalf of institutional shareholders of Pfizer, Inc." (Wang Decl. Ex. 45 at PFE PLTF 0003108; Ex. 46 at PFE PLTF 0003116; Ex. 47 at PFE PLTF 0003113; Ex. 48 at PFE PLTF 0003122). Granite Intelligence's investigators asked the Quoted Former Employees about their general understanding of the drug development and marketing process at Pharmacia, including the role of senior management (Wang Decl. Exs. 45–48). These interviews were reduced to contemporaneous memoranda (Wang Decl. Exs. 45–48).

The following statements were attributed to the Quoted Former Employees in the CCAC:

*Dr. Talley:* "Dr. John Talley, one of the developers of Celebrex and Bextra, informed Plaintiffs' counsel that senior managers were 'right on top of' the clinical studies related to Celebrex in [*sic* ] Bextra" (Docket Item 51 ¶ 76).

*Mr. Dodson:* "Similarly, Paul Dodson, the former Senior Director of Strategic Planning and Regional operations for Pharmacia, acknowledged to Plaintiffs' counsel that decisions on what drugs to bring to market and when to launch such drugs ultimately 'comes from the top.' He further stated that information on clinical trial findings would be reported to top management and would be reported with some specificity where there was 'some negative effect or a problem' with the drug. He specifically noted that the cardiovascular safety profile of Celebrex was a big issue with top management and that Dr. Needleman (the director of research at Searle and Pharmacia) was the person responsible for updating top management on significant developments relating to Celebrex and Bextra" (Docket Item 51 ¶ 76).

*Ms. Fox:* "Krista Fox, a former Global Marketing Communications Manager at Pharmacia, explained that information regarding the clinical trials of a drug was disseminated to key decision-makers. She stated that Pharmacia, like all other companies, had a medical information group within the company that 'knows the science of a drug inside and out as well as adverse events, issues and concerns relating to the drug. Anything that you are going to get out to the public as it relates to sales and

---

5. The "Hard CHD" category included myocardial infarction and sudden cardiac death events that were reported in the clinical trial data (Wang Decl. Ex. 1 at 4).

6. The CCAC is no longer the operative pleading in this action. Plaintiffs filed an Amended Consolidated Class Action Complaint on March 27, 2012 (Docket Item 361).

marketing efforts has to go through a review committee which usually consists of legal, medical and regulatory and they are experts on the drug and they have to approve everything'" (Docket Item 51 ¶ 77).

*Mr. Watson:* "Andrew Watson, a Senior Product Manager on the Celebrex brand, explained how the key information was known to the 'brand team' decision makers. He explained that the brand team gets involved in the R & D process through the new drug application stage because 'you want to think about how you're going to be able to commercialize a product when it finally comes to market, so as much involvement as you can the better.' Watson acknowledged that brand teams would have been aware of the science behind a drug, inclusive of the R & D as well as the risks and efficacy of a brand. He further acknowledged that between the filing of a new drug application with the FDA and final FDA approval of a drug, the brand team is working with many other groups including the marketing people and the finance people in order to get the drug to market" (Docket Item 51 ¶ 79).

In addition, the CCAC alleged that: "According to Dr. Talley, members of senior management were well aware of the clinical studies that were conducted on Celebrex and Bextra. Statements by former employees of Pharmacia (now Pfizer) who worked on Celebrex, Krista S. Fox, Paul V. Dodson and Andrew Watson, confirm that any negative effect or problem with a drug was reported to top management" (Docket Item 51 ¶ 253; *see also* ¶ 5). In the CCAC, Plaintiffs relied on the statements of the Quoted Former Employees to support their allegations of scienter—namely that the individual defendants knew or were in a position to have known about material information concerning the adverse safety risks associated with Celebrex and Bextra (Docket Item 51 ¶ 82).

When the CCAC was filed, none of the Quoted Former Employees was aware that his or her statements had been used (Wang Decl. Ex. 49 ¶ 3; Ex. 50 ¶ 5; Ex. 51 ¶ 5; Ex. 52 ¶ 3). Counsel for Pfizer contacted the Quoted Former Employees in the latter half of 2011. Each reviewed the CCAC and his or her interview memoranda (Wang Decl. Ex. 49 ¶¶ 5, 8; Ex. 50 ¶¶ 6, 15; Ex. 51 ¶¶ 6, 15; Ex. 52 ¶¶ 4, 8). The Quoted Former Employees disagreed with the manner in which the CCAC had characterized their statements. They stated that they believed that the CCAC was inaccurate and misleading because their statements had been used to support the allegation that Pfizer's senior management knew about the cardiovascular safety risks associated with Celebrex and Bextra, notwithstanding that none of the Quoted Former Employees had explicitly said that (Wang Decl. Ex. 49 ¶¶ 11–12; Ex. 50 ¶ 10; Ex. 51 ¶ 9; Ex. 52 ¶¶ 4, 11). Each maintained that he or she did not believe that anyone at Pfizer or Pharmacia had engaged in any wrongdoing in connection with Celebrex and Bextra, and none was aware of any evidence of wrongdoing (Wang Decl. Ex. 49 ¶¶ 11–12; Ex. 50 ¶ 10; Ex. 51 ¶ 9; Ex. 52 ¶¶ 4, 11). They also all stated that they would not have spoken to Plaintiffs' investigator had they known that it was acting on behalf of a party suing Pfizer (Wang Decl. Ex. 49 ¶ 6; Ex. 50 ¶ 15; Ex. 51 ¶ 15; Ex. 52 ¶ 10). The Quoted Former Employees, however, did not disavow the substance or the accuracy of the statements attributed to them in the CCAC, but rather only the inferences that Plaintiffs drew from those statements.

### III. *Analysis*

#### A. *Applicable Law: Spoliation Sanctions*

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber, Co.,* 167 F.3d 776, 779 (2d Cir.1999). A court may impose sanctions based on Federal Rule of Civil Procedure 37(b) if a party fails to comply with a discovery order. Fed. R.Civ.P.37(b); *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002); *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991) (Francis, M.J.). A court may also impose sanctions on a spoliating party based on its "inherent power to control the judicial process

and litigation, but [that] power is limited to that necessary to redress conduct which abuses the judicial process." *Passlogix, Inc. v. 2FA Tech., LLC,* 708 F.Supp.2d 378, 409 (S.D.N.Y.2010) (Leisure, D.J.) (internal quotation marks omitted), *quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 685 F.Supp.2d 456, 465 (S.D.N.Y.2010) (Scheindlin, D.J.), *abrogated on other grounds by Chin v. Port Auth. of N.Y. & N.J.,* 685 F.3d 135 (2d Cir.2012). " 'The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.' " *Zubulake v. UBS Warburg, LLC,* 229 F.R.D. 422, 430 (S.D.N.Y.2004) (Scheindlin, D.J.), *quoting Fujitsu v. Federal Express Corp.,* 247 F.3d 423, 436 (2d Cir.2001); *see also Harkabi v. SanDisk Corp.,* 275 F.R.D. 414, 418 (S.D.N.Y.2010) (Pauley, D.J.).

■ A party who seeks sanctions based on the spoliation of evidence must show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Zubulake v. UBS Warburg, LLC, supra,* 229 F.R.D. at 430; *see also Chin v. Port Auth. of N.Y. & N.J., supra,* 685 F.3d at 162. If the moving party satisfies these elements, the "court may, in its discretion, grant an adverse inference jury instruction or other sanctions insofar as such a sanction would 'serve the threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.' " *Chin v. Port Auth. of N.Y. & N.J., supra,* 685 F.3d at 162 (internal alterations omitted), *quoting Byrnie v. Town of Cromwell,* 243 F.3d 93, 107 (2d Cir.2001).

### 1. Duty To Preserve

■ "A litigant has the 'duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.' " *Passlogix, Inc. v. 2FA Tech., LLC, supra,* 708 F.Supp.2d at 409, *quoting Turner v. Hudson Transit Lines, Inc., supra,* 142 F.R.D. at 72. The " 'obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation ... for example when a party should have known that the evidence may be relevant to future litigation.' " *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.,* 769 F.Supp.2d 269, 289 (S.D.N.Y.2011) (Francis, M.J.) (alteration in original), *quoting Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998), *overruled on other grounds, Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). Put another way, "the preservation requirement arises when a party 'reasonably anticipates litigation.' " *Orbit One Commc'ns, Inc. v. Numerex Corp.,* 271 F.R.D. 429, 436 (S.D.N.Y.2010) (Francis, M.J.) (internal citations omitted).

■ "Evidence that must be preserved includes documents, electronically stored information, and physical evidence that the party knows or reasonably should know is relevant to claims or defenses in the action, is reasonably calculated to lead to the discovery of admissible evidence, or is reasonably likely to be requested during discovery." *R.F.M.A.S., Inc. v. So,* 271 F.R.D. 13, 23–24 (S.D.N.Y.2010) (Dolinger, M.J.) (internal citations omitted). "[T]he duty to preserve extends to those employees likely to have relevant information—the 'key players' in the case." *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 218 (S.D.N.Y.2003). Though a party is required to retain all relevant documents in existence at the time the duty to preserve attaches and any relevant documents created thereafter, it is not required to preserve "multiple identical copies." *Zubulake v. UBS Warburg LLC, supra,* 220 F.R.D. at 218. "In recognition of the fact

that there are many ways to manage electronic data, litigants are free to choose how this task is accomplished." *Zubulake v. UBS Warburg LLC, supra,* 220 F.R.D. at 218.

There appears to be some uncertainty in this district about the role of counsel with respect to a party's duty to preserve. The Honorable Shira A. Scheindlin, United States District Judge, has held that "[c]ounsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents" and that this requires counsel to "become fully familiar with her client's document retention policies, as well as the client's data retention architecture." *Zubulake v. UBS Warburg LLC, supra,* 229 F.R.D. at 432. Other courts have followed this analysis in determining whether to impose sanctions. *See, e.g., Phoenix Four, Inc. v. Strategic Resources Corp.,* 05 Civ. 4837(HB), 2006 WL 1409413, at *6 (S.D.N.Y. May 23, 2006) (Baer, D.J.) (counsel acted with gross negligence when it did not undertake the "more methodical survey" of its client's sources of information as outlined in *Zubulake* ); *Richard Green (Fine Paintings) v. McClendon,* 262 F.R.D. 284, 290 (S.D.N.Y.2009) (Francis, M.J.) (following *Zubulake* ); *see also Telecom Int'l America, Ltd. v. AT & T Corp.,* 189 F.R.D. 76, 81 (S.D.N.Y.1999) (Hellerstein, D.J.) ("Once on notice, the obligation to preserve runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation."). In contrast, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge, has noted that "[t]he Second Circuit, however, places the obligation to preserve evidence on the party." *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.,* 783 F.Supp.2d 736, 742 (S.D.N.Y.2011) (Gorenstein, M.J.), *citing Fujitsu Ltd. v. Fed. Exp. Corp.,* 247 F.3d 423, 436 (2d Cir.2001) and *Kronisch v. United States, supra,* 150 F.3d at 126; *see also Kyoei Fire & Marine Ins. Co. v. M/V Maritime Antalya,* 248 F.R.D. 126, 146–48 (S.D.N.Y.2007) (Preska, D.J.) (analyzing obligation to preserve in context of par-

ty's, not counsel's, efforts). My research has not disclosed any Second Circuit precedent that places the duty to preserve on a party's counsel, and accordingly, I shall only evaluate the duty to preserve in context of the parties' actions here.[7]

### 2. *Culpable State Of Mind*

"Even where the preservation obligation has been breached, sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind." *In re WRT Energy Sec. Litig.,* 246 F.R.D. 185, 195 (S.D.N.Y.2007) (Francis, M.J.). A court may impose sanctions if it finds that the party acted at least negligently in destroying or losing the spoliated material. *Harkabi v. SanDisk Corp., supra,* 275 F.R.D. at 418; *see Orbit One Commc'ns, Inc. v. Numerex Corp., supra,* 271 F.R.D. at 438 ("In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence."); *see also In re NTL, Inc. Sec. Litig.,* 244 F.R.D. 179, 198 (S.D.N.Y.2007) (Peck, M.J.). "In the discovery context, negligence is a 'failure to conform to the standard' of 'what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding.' 'A failure to conform to this standard is negligence even if it results from a pure heart and an empty head.' " *Harkabi v. SanDisk Corp., supra,* 275 F.R.D. at 418–19 (internal alteration omitted), *quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, supra,* 685 F.Supp.2d at 464.

Gross negligence also satisfies the culpability requirement. *Harkabi v. SanDisk Corp., supra,* 275 F.R.D. at 419. As Judge Scheindlin has articulated:

[T]he following failures support a finding of gross negligence, when the duty to preserve has attached: ... to identify all of the key players and to ensure that their electronic and paper records are preserved; to cease the deletion of email or to preserve the records of former employees that are in a party's possession, custody, or

**7.** This is particularly appropriate here. In their opening brief, Plaintiffs specifically note that they are only seeking sanctions against Pfizer as an entity and not against Pfizer's counsel (Docket Item 426, Plaintiffs' Memorandum of Law in Support of Motion for Spoliation and Other Sanctions Against Defendant Pfizer Inc. "Pls.' Mem." at 2 n. 1).

control; and to preserve backup tapes when they are the sole source of relevant information or when they relate to key players, if the relevant information maintained by those parties is not obtainable from readily accessible sources.

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, supra,* 685 F.Supp.2d at 471.

■ The failure of a party to institute a litigation hold does not constitute gross negligence *per se. Chin v. Port Auth. of N.Y. & N.J., supra,* 685 F.3d at 162. Rather, the Court of Appeals for the Second Circuit has recently held that " 'the better approach is to consider [the failure to adopt good preservation practices] as one factor' in the determination of whether discovery sanctions should issue." *Chin v. Port Auth. of N.Y. & N.J., supra,* 685 F.3d at 162 (alteration in original), *quoting Orbit Commc'ns Inc. v. Numerex Corp., supra,* 271 F.R.D. at 441.

■ However, "[a] finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction" or to award other sanctions. *Chin v. Port Auth. of N.Y. & N.J., supra,* 685 F.3d at 162. The Court of Appeals has instructed that a " 'case-by-case approach for the failure to produce relevant evidence,' at the discretion of the district court, is appropriate." *Chin v. Port Authority of N.Y. & N.J., supra,* 685 F.3d at 162, *quoting Residential Funding Corp. v. DeGeorge Fin. Corp., supra,* 306 F.3d at 108.

### 3. *Relevance*

■ If the spoliating party has acted only negligently, the moving party can satisfy the final requirement of the spoliation analysis if it can show that the lost materials were relevant. *Harkabi v. SanDisk Corp., supra,* 275 F.R.D. at 419–20. "[T]he Court of Appeals has held that for the destroyed evidence to be 'relevant' it must be 'more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.' " *Kyoei Fire & Marine Ins. Co. v. M/V Maritime Antalya, supra,* 248 F.R.D. at 144, *quoting Residential Funding Corp. v. DeGeorge Fin. Corp., supra,* 306 F.3d at 108–09. A party may establish relevance by " 'adduc[ing] suf-

ficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.' " *Harkabi v. SanDisk Corp., supra,* 275 F.R.D. at 420 (alterations in original), *quoting Residential Funding Corp. v. DeGeorge Fin. Corp., supra,* 306 F.3d at 109; *see also Richard Green (Fine Paintings) v. McClendon, supra,* 262 F.R.D. at 291 (moving party "must present extrinsic evidence tending to show that the destroyed [documents] would have been favorable to their case." (alteration in original and internal citations omitted)); *Chan v. Triple 8 Palace, Inc.,* No. 03 Civ. 6048(GEL)(JCF), 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005) (Francis, M.J.) (to establish relevance, "the moving party may submit extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to it"); *Zubulake v. UBS Warburg LLC, supra,* 229 F.R.D. at 431 (internal footnotes omitted) ("[T]he concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant."). However, a court must not "hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would subvert the purpose of the adverse inference, and allow parties who have destroyed evidence to profit from that destruction." *In re NTL, Inc. Sec. Litig., supra,* 244 F.R.D. at 199 (internal citations and alterations omitted); *see also In re WRT Energy Sec. Litig., supra,* 246 F.R.D. at 197 ("[T]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction.").

■ However, " '[w]here a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to the party.' " *In re WRT Energy Sec. Litig., supra,* 246 F.R.D. at 198, *quoting Residential Funding Corp. v. DeGeorge Fin. Corp., supra,* 306 F.3d at 109; *see also Passlogix, Inc.*

v. 2FA Tech., LLC, supra, 708 F.Supp.2d at 411 ("To have a sufficiently culpable state of mind warranting a relevance inference, the spoliator must have acted in bad faith—that is, intentionally or willfully."); Arista Records LLC v. Usenet.com, Inc., 633 F.Supp.2d 124, 141 (S.D.N.Y.2009) (Baer, D.J.) ("[W]hen evidence is destroyed in bad faith or with gross negligence, that alone has been found to be sufficient to support an inference that the missing evidence would have been favorable to the prejudiced party, and thus relevant.").

▉▉▉▉ "Nonetheless, a court should never impose spoliation sanctions of any sort unless there has been a showing—inferential or otherwise—that the movant has suffered prejudice." GenOn Mid–Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 353 (S.D.N.Y.2012) (Maas, M.J.); see also Passlogix, Inc. v. 2FA Tech., LLC, supra, 708 F.Supp.2d at 412 ("Moreover, 'when the spoliating party [is] merely negligent, the innocent party must prove both relevance and prejudice in order to justify the imposition of a severe sanction.'" (alteration in original), quoting Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, supra, 685 F.Supp.2d at 467–68).

> The noncompliant party bears the burden to demonstrate that the other parties did not suffer any prejudice from the spoliation. Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source, or that during discovery they never asked for the evidence later shown to have been spoliated.

R.F.M.A.S., Inc. v. So, supra, 271 F.R.D. at 24–25 (internal citations omitted).

### B. Application of Law: Plaintiffs' Motion for Sanctions

Plaintiffs contend that Pfizer should be sanctioned because (1) metadata from the eRooms have been destroyed; (2) entire eRooms have allegedly been destroyed or lost; and (3) certain relevant documents from Pfizer's productions are missing. I conclude that Plaintiffs are not entitled to sanctions on any of these grounds.

### 1. Pfizer's Duty to Preserve

The parties do not dispute that Pfizer implemented a litigation hold in this matter and, accordingly, Pfizer did not breach its duty in that respect. The parties, however, disagree about when Pfizer's duty to impose this hold commenced. Plaintiffs argue that Pfizer's duty to preserve arose in 2001 when it was first became involved in a patent dispute related to Celebrex and Bextra. Pfizer contends that its duty to preserve attached in this action when the first complaint was filed on December 15, 2004 and that the earlier patent litigation did not trigger its duty. Further, Pfizer claims that there are no documents, and Plaintiffs have failed to identify any, under Pfizer's custody and control that have been destroyed or lost after December 15, 2004.

▉▉▉▉ I conclude that Pfizer's duty to preserve in this case arose in 2004, not in 2001. The 2001 lawsuit was a patent action related to the identification of the enzyme that led to the development of Celebrex and Bextra. As such, it raised different factual issues from the instant action and would not have given Pfizer reasonable notice of the foreseeability of this securities fraud litigation. Cf. Byrnie v. Town of Cromwell, supra, 243 F.3d at 108 (party had notice of duty to preserve before complaint was filed where it had previously received FOIA requests and others had expressed concerns about the subject matter of the suit); Kraus v. Gen. Motors Corp., 03 Civ. 4467 (CM), 2007 WL 3146911, at *2 (S.D.N.Y. Oct. 24, 2007) (McMahon, D.J.) (defendant under no duty to preserve car as evidence in products liability suit before complaint was filed because it had not been previously notified of any injury that might reasonably lead to litigation and no litigation had been threatened); M & T Mortg. Corp. v. Miller, 02 Civ. 5410(NG)(MDG), 2007 WL 2403565, at *5 (E.D.N.Y. Aug. 17, 2007) (duty to preserve attached as of date of an earlier action when the allegations in the earlier action were "strikingly similar" to the current action); see also Brigham Young Univ. v. Pfizer, Inc., 282 F.R.D. 566, 572 (D.Utah

2012) (rejecting argument that Pfizer's duty to preserve extended back to earlier, unrelated litigations). In addition, the duty to preserve only extends to documents relevant to the claim of which the party has notice. For example, documents bearing on conception and reduction to practice may be critical in a patent case in which the priority of inventions of a drug is in issue. It is difficult to understand, however, how such claims would trigger an obligation to preserve documents concerning the side effects experienced by some patients taking the drug. Thus, because Pfizer's obligation to preserve did not accrue before 2004 and Pfizer did timely issue a hold on December 17, 2004, it did not breach its duty to preserve in this respect.

With respect to the scope of Pfizer's duty to preserve, Plaintiffs claim that Pfizer should have maintained the eRooms in the state in which they existed in 2004 and that the 2011 archiving project resulted in the destruction of relevant evidence. According to Plaintiffs, had the eRooms been subject to the litigation hold in 2004, they would have been able to establish what information was shared between Pfizer and Pharmacia about the cardiovascular risks associated with Celebrex and Bextra and who at Pfizer had access to this information. Pfizer responds that to the extent that any documents were lost or destroyed, the documents contained in the eRooms would have been duplicative of the custodial productions and that some eRooms were either consolidated into other eRooms or only contained non-substantive information. Additionally, Pfizer argues that neither the eRooms nor their metadata reflect who accessed particular documents contained in them.

A party is not required to preserve all exact duplicate copies of documents, but it is required to preserve all sources of potentially relevant evidence. Although the eRooms contain documents that may be largely duplicative of the custodial productions, they have a value in of themselves as compilations. The manner in which Pfizer and its employees internally organized documents is relevant because it allows Plaintiffs to draw connections and understand the narrative of events in a way not necessarily afforded by a custodial production. Accordingly, Pfizer's duty to preserve extended to the eRooms and the failure to maintain them as of December 17, 2004 is a breach of Pfizer's obligation to preserve relevant documents. Thus, Plaintiffs have satisfied the first requirement of the spoliation analysis.

### 2. *Pfizer's Culpability*

Plaintiffs argue that Pfizer acted with at least gross negligence, if not willfulness, because Pfizer (1) repeatedly misrepresented the non-existence of the eRooms and the centralized databases in this action and other actions; (2) did not place a litigation hold on these sources; and (3) did not appropriately monitor its existing litigation hold. Pfizer responds that, to the extent there is any missing evidence, it did not act wilfully or intentionally in light of its good faith efforts to locate and restore all the eRooms Plaintiffs have identified and its otherwise full cooperation with Plaintiffs' discovery requests.

I conclude that Pfizer's conduct is, at most, negligent. Pfizer's conduct with respect to the eRooms and the centralized databases must be viewed in the context of the entire discovery process in this case. This history reflects that, to a large extent, Pfizer did comply with its discovery obligations. First, Pfizer instituted a litigation hold at the outset of this case and identified the "key players" to Plaintiffs by naming relevant custodians, as well as producing regulatory and clinical-trial files and other legacy company files. This resulted in the production of 40 million pages of documents from 94 custodians. Though Pfizer's hold did not ultimately reach the eRooms and the centralized databases at issue here, there is no indication that this failure was willful rather than only negligent. *See De Espana v. American Bureau of Shipping,* 03 Civ. 3573(LTS)(RLE), 2007 WL 1686327, at *6 (S.D.N.Y. June 6, 2007) (Ellis, M.J.) (finding that party acted only negligently notwithstanding that its "preservation efforts regarding electronic records within those agencies were inadequate and untimely"); *see also GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., supra,* 282 F.R.D. at 357 (party only negligent when it failed to take any steps beyond gen-

eral backup procedures to preserve evidence after litigation was anticipated).

Pfizer did not conceal the existence of either the eRooms or the centralized databases. Though Plaintiffs may have preferred to receive documents grouped by study, rather than by custodian, Pfizer's response that it did not maintain documents according to the specific categories that Plaintiffs had listed in their document requests does not rise to the level of a purposeful misrepresentation, despite its narrow wording. Plaintiffs' argument that Pfizer's failure to take server snapshots of the eRooms and the centralized databases warrants a finding of a culpability greater than negligence is without merit. Although these snapshots could have proven what documents existed in these sources when the litigation hold was first placed, Pfizer's failure to do so amounts to no more than negligence, given that Pfizer preserved both electronic and hard copy documents of relevant custodians, as well as other pertinent clinical trial and regulatory files. Accordingly, the failure to take server snapshots did not result in the complete lack of preservation of relevant evidence and does not demonstrate more than negligence.

Although Plaintiffs are correct that Pfizer was previously sanctioned for discovery abuses in two other actions, the rulings in those actions do not prove willful or bad faith misconduct here. In *Brigham Young University v. Pfizer, Inc.*, 262 F.R.D. 637 (D.Utah 2009), Pfizer was sanctioned for failing to produce documents. In that decision, the Honorable Brooke Wells, United States Magistrate Judge, found that Pfizer was guilty of negligence, but was not guilty of willfulness or bad faith;[8] the sanction was limited to the payment of plaintiff's attorneys' fees and further discovery concerning the completeness of Pfizer's search for documents. Pfizer's prior acts of negligence are not admissible to prove that it was negligent here. Fed.R.Evid. 404(b); *Jones v. Southern Pac. R.R.*, 962 F.2d 447, 449 (5th Cir. 1992). *A fortiori*, they cannot prove a more culpable mental state.

In *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2011 WL 2357793 (D.N.J. June 9, 2011), Pfizer was sanctioned for failing to produce a properly prepared 30(b)(6) witness and for its counsel's conduct at a 30(b)(6) deposition. This misconduct is so factually distinct from the completeness of Pfizer's search for documents that it has minimal relevance here, and does not support an inference that Pfizer's conduct here was willful or in bad faith.

Finally, and most importantly, once it became clear that the eRooms and centralized databases existed and contained relevant documents, Pfizer worked with Plaintiffs to ensure the production of documents from these sources, including foregoing an initial privilege and relevancy review. Pfizer has also documented its efforts to identify, locate and restore all the eRooms Plaintiffs had requested (Wellschlager Decl. App. B). It is also important to bear in mind that the eRooms contained documents which likely would have been located elsewhere, *i.e.*, in the custodial file of the person who created the document. Although its efforts may not have been perfect, Pfizer did endeavor to meet all its obligations once additional document repositories were identified and did produce an additional 20 million pages of documents. Given its initial document production and Plaintiffs' inability to identify any critical or "smoking gun" documents first disclosed as part of the eRoom production, Pfizer's actions in discovery do not suggest willful delay or purposeful sluggishness. Despite Pfizer's partially inadequate preservation efforts, these failures did not amount to a total disregard of its discovery obligations. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, *supra*, 685 F.Supp.2d at 465 ("[T]he failure to take all appropriate measures to preserve ESI likely falls in the negligence category"), *citing Treppel v. Biovail Corp.*, 249 F.R.D. 111, 121 (S.D.N.Y.2008) (Francis, M.J.); *cf. Residential Funding Corp. v. DeGeorge Fin. Corp.*, *supra*, 306 F.3d at 112; *Adorno v. Port Auth. of N.Y. & N.J.*, 258 F.R.D. 217,

---

**8.** Although Magistrate Judge Wells did find that "Pfizer's [document] production has been negligent to the point that it closely approaches a finding of bad faith," she expressly declined to find that Pfizer acted willfully or in bad faith. 262 F.R.D. at 645.

228 (S.D.N.Y.2009) (Chin, then D.J., now Cir. J.) (finding defendant acted only with negligence where the plaintiffs had not shown "a wholesale failure by the Port Authority to put in place a 'litigation hold' or otherwise communicate document or destruction policies to its employees, such that a finding of gross negligence by defendant would be appropriate"); *Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 169–70 (S.D.N.Y.2004) (sanctions not warranted notwithstanding party's initial failure to produce certain documents and "its erroneous representations that such documents did not exist"). Accordingly, I find that Pfizer has acted only with negligence.

### 3. *Relevance*

Because Pfizer's spoliation was only negligent, Plaintiffs "must demonstrate that a reasonable trier of fact could find the missing [evidence] would support [their] claims." *Treppel v. Biovail Corp., supra,* 249 F.R.D. at 122, *quoting Zubulake v. UBS Warburg LLC, supra,* 220 F.R.D. at 221 (first alteration in original). Plaintiffs have identified several different categories of spoliated evidence that they contend would have been favorable to them and, thus, are relevant.

### a. *eRoom Metadata and Membership Lists*

First, Plaintiffs claim that metadata from the eRooms, including "membership records, lists, usage and facility reports, security logs for all relevant eRooms as they existed during the Class Period and at the start of this case" have been lost (Docket Item 429, Plaintiffs' Reply Brief in Further Support of Motion for Spoliation and Other Sanctions Against Defendant Pfizer Inc. ("Pls.' Reply") at 2).[9] According to Plaintiffs, this information is directly relevant to the individual defendants' scienter. Pfizer contends that the restored eRooms contain all the metadata

that existed at the time the eRoom was archived.

■ Plaintiffs have not established the relevance of the lost metadata from the Class Period. As an initial matter, there is no real dispute that restored eRooms do not contain the metadata as it existed during the Class Period, but rather only contain the metadata as it existed when the particular eRoom was archived. For example, usage reports were only kept for one year, and not on a cumulative basis. In addition, membership lists reflect only members as of the time the eRoom was archived. Because many of the eRooms were archived in 2011, this means that these lists would not reflect an eRoom's members throughout the Class Period. Thus, some metadata has been lost. Despite this lost evidence, there is no basis to impose sanctions.

While the metadata contained in the usage reports in the facility eRooms would have reflected who created documents and when these documents were created during the Class Period, it would not reflect what individual users viewed or accessed such documents. Similarly, although the server logs or security logs tracked when a user logged in or out of an eRoom, they did not record what, if anything, that user might have accessed. As such, the evidentiary value of this information with respect to the individual defendants' scienter would be minimal because it could not be used to establish whether an individual defendant accessed a particular document concerning the risks of Celebrex and Bextra, assuming the eRooms contained such documents. Moreover, many of the eRoom reports, including the usage reports, reflected largely administrative information—such as server capacity—that has no bearing on the securities fraud issues raised in this action. Most importantly, Plaintiffs have not demonstrated prejudice.

---

9. In their reply brief, Plaintiffs also claim that the contents of the eRoom recycling bins have been lost (Pls.' Reply at 2). While eRooms did have recycling bins that were capable of permanently deleting material (*see* Thomas Decl. Ex. 99), Plaintiffs have not offered any evidence that indicates or otherwise suggests that relevant evidence was placed in the eRooms' recycling bins. Even if relevant evidence had been deleted from

an eRoom, Pfizer has represented that it would have likely also existed in custodial file of the person who created it (Wellschlager Decl. Ex. 6 at 173:13–175:5, Thomas Decl. Ex. 40 at 16). In this absence of proof of relevance or prejudice, Plaintiffs are not entitled to sanctions from any spoliation that may have resulted from Pfizer's use of the eRoom recycling bins.

Plaintiffs do not contend that this metadata is the only source of scienter evidence, but rather only that it "would clearly be helpful to Plaintiffs in proving their case" (Pls.' Mem. at 20). Plaintiffs do not explain how the metadata would "clearly be helpful" to them and such utility is not clear to me. Thus, I conclude that there is no basis to award sanctions arising from the lost eRoom metadata because Plaintiffs have failed to establish its relevance.

■ With respect to the eRoom membership lists, Plaintiffs claim that Pfizer created such lists for all of its eRooms in addition to the membership lists that can be automatically generated by the eRoom software and accessed from within the eRoom itself (Pls.' Reply at 2 n. 1). In support of their claim that such separate membership lists exist, Plaintiffs point to: (1) several of their own demonstrative exhibits; (2) several Pfizer emails sent to certain members of some eRooms; and (3) several screen shots taken of eRoom membership lists from within the restored eRooms (Thomas Decl. Exs. 58–62b). These documents, however, do not demonstrate that Pfizer maintained membership lists for its eRooms apart from the lists generated by and accessible within the eRoom itself. With respect to the demonstrative exhibits which compare membership lists for particular eRooms over time, they show only that the membership of an eRoom was not static, but not that Pfizer maintained historical membership lists for its eRooms in the regular course of business. The emails demonstrate, at most, that Pfizer used email to communicate with eRoom members, but not that these emails served as a comprehensive or historical record of a particular eRoom's members. Furthermore, Plaintiffs do not claim that Pfizer has not produced all other similar emails that might have been sent to eRoom members. The screenshots of the eRoom membership lists merely show that the eRoom software is capable of generating such lists, but not that Pfizer maintained a history of these lists as members were either added or deleted. Thus, because

Plaintiffs have failed to show that Pfizer routinely maintained membership lists for its eRooms outside of the eRoom themselves, there is no spoliation and no basis for sanctions.

### b. *COX–2 Alliance eRooms*

■ Second, Plaintiffs claim that multiple eRooms from the COX–2 Alliance [10] have been deleted and that these eRooms are relevant because they "were the direct line of e-communication between Pfizer and its co-promoter Pharmacia" (Thomas Decl. ¶ 49). Pfizer maintains that no eRooms with substantive information were deleted and that some of the eRooms Plaintiffs have identified as deleted were consolidated into other existing eRooms (Wellschlager Decl. Ex. 6 at 75:12–76:24).

In support of their argument, Plaintiffs have identified several documents that explain, as a general matter, the purpose and function of eRooms (Thomas Decl. ¶¶ 49–50)

1. A July 11, 2002 email referred to the "COX–2 Commercial Leadership Team" eRoom (Thomas Decl. Ex. 72), which was described in a August 2002 document as "a collaborative application available for Alliance Business Team members to share documents, share calendars, archive email, conduct discussions/instant messaging, and to conduct informal polls. Other suggested uses include sharing of operational plans, Review Committee Activities, market reports, meeting minutes, and agendas" (Thomas Decl. Ex. 70 at 2);

2. A COX–2 Alliance newsletter which reported in pertinent part that "An E–Room system has just been approved by the COX–2 Alliance that will create a direct line for e-communication between Pfizer and Pharmacia" (Thomas Decl. Ex. 102 at Sirota–E 10000230779); and

3. An evaluation of a Pharmacia employee who was a director of Alliance Management that noted that the employee had "Completed roll out of and training of eRoom, in September 2002. This tool is now being utilized across the alliance to

---

**10.** The COX–2 Alliance refers to a joint marketing effort by Pfizer and Pharmacia to promote

Celebrex and Bextra.

facilitate resolution of significant issues in addition to day-to-day work processes" (Thomas Decl. Ex. 103 at PHARMACIA DOCUMENTS 00267285).

These documents are informative to the extent that they describe, in broad strokes, the intended purposes of the eRooms. They, however, do not shed light on what specific documents were actually located in these eRooms or how these documents would have been favorable to Plaintiffs' securities fraud claims. With respect to the COX–2 Commercial Leadership Team eRoom, an email reference, even taken in conjunction with a document describing its general purpose, does not demonstrate that specific relevant documents were actually placed in this allegedly lost eRoom. The email reference does not detail what specific documents this eRoom would have contained. Plaintiffs' second and third examples similarly fail to establish relevance. The general description of the purpose of the eRooms does not demonstrate what, if any, relevant documents could have been found in these eRooms. *See Treppel v. Biovail Corp., supra,* 249 F.R.D. at 122–23 (generalized assertions that missing evidence is relevant is insufficient to establish relevancy).

Moreover, Plaintiffs have not been prejudiced. First, any documents that were contained in these allegedly missing COX–2 Alliance eRooms would have also likely been found in the custodial file of the person who created the documents. Second, Pfizer informed Plaintiffs that to the extent that a potentially relevant COX–2 Alliance eRoom only contained a link to another eRoom, that linked eRoom was archived. Though Plaintiffs complain that Pfizer never specifically identified these linked eRooms (Thomas Decl. Ex. 69 at 1), a failure to identify is not equivalent to a failure to preserve. Accordingly, Plaintiffs have not satisfied the relevance prong with respect to the missing COX–2 Alliance eRooms and no sanctions are warranted with respect to them.

c. *SCOP and WW Oncology eRooms*

■ Plaintiffs next contend that two other eRooms, the Strategic Clinical Operation Plan ("SCOP") eRoom and the WW Oncology eRoom, were not produced and that they contain relevant information (Pls.' Reply at 3). Specifically, Plaintiffs claim that the SCOP eRoom contained information related to Pfizer's clinical operation plan (Thomas Decl. Ex. 74) and that the WW Oncology eRoom contained information related to Pfizer's master clinical study monitoring report (Thomas Decl. Ex. 75). Pfizer responds that eRooms with these specific names did not exist (Wellschlager Decl. App. B at Line 46). Further, with respect to the SCOP eRoom, Pfizer contends that the production of three other eRooms—the WW DVP SCOP eRoom, the PGP Monthly Medical Reports eRoom, and the WWSCOPCentral eRoom—contained any relevant SCOP documents and subfolders (Wellschlager Decl. App. B at Line 47). With respect to the WW Oncology eRoom, Pfizer located a Pfizer Oncology eRoom, but due to technical difficulty, it was unable to restore it using the eRoom software and instead provided Plaintiffs with its data in a native file (Wellschlager Decl. App. B at Line 50). Pfizer also points out that it produced the Arthritis Pain Oncology Repository Information eRoom, which would have contained documents similar to those that would have been found in the alleged WW Oncology eRoom (Wellschlager Decl. App. B at Line 50).

Plaintiffs have not established the relevance of these allegedly missing eRooms. Though Plaintiffs have pointed to emails which refer to these eRooms as the "SCOP eRoom" and the "WW Oncology eRoom" (*see* Thomas Decl. Exs. 74–75), the fact that Pfizer employees may have referred to these eRooms with those particular names does not establish that these were the actual names of the eRooms. Moreover, despite being unable to locate these precise eRooms, Pfizer has produced other eRooms that it believes contained documents similar to those that may have been contained in the two eRooms Plaintiffs specifically identified (Wellschlager Decl. App. A at Line 46; App. B at Lines 47, 50). Finally, even assuming that these two eRooms are missing, a party cannot establish the relevancy of documents merely by pointing to their non-production. *Mitchell v. Fishbein,* 01 Civ. 2760(JGK)(GWG), 2007 WL 2669581, at *5 (S.D.N.Y. Sept. 13, 2007) (Gor-

enstein, M.J.). In light of Pfizer's apparent production of responsive documents, Plaintiffs have not established that these eRooms and the documents contained within them are in fact missing or that they have been prejudiced. There is no basis for sanctions because Plaintiffs have failed to satisfy the relevancy prong with respect to these two eRooms.

d. *Documents Allegedly Missing from Pfizer's Custodial Productions*

Plaintiffs next claim that Pfizer's production from the custodial files, the eRooms and the centralized databases is incomplete and that specific relevant documents have not been produced (Pls.' Mem. at 21; Thomas Decl. ¶¶ 52–61). Pfizer responds (1) that it was under no obligation to preserve many of these allegedly missing documents because they pre-date Pfizer's duty to preserve in this action and (2) that it has actually produced some of these documents (*see* Wellschlager Decl. App. B at Lines 47–53).

■ Plaintiffs' first example of the incomplete custodial production relates to Mona Wahba (Thomas Decl. ¶ 19). On May 23, 2000, Ms. Wahba wrote an email to Samuel Zwillich, a member of Pfizer's clinical research team, to report that a medical conference had favorably viewed the result of a clinical study (Thomas Decl. Ex. 17). Mr. Zwillich responded, "They swallowed our story, hook, line and sinker . . ." (Thomas Decl. Ex. 17). This email was produced in the New Jersey securities action, but was not produced in this action, even though Ms. Wahba was identified as a custodian.[11] Pfizer responds that this email was not within Ms. Wahba's custodial file, but rather was in the file of Mr. Zwillich, who was not identified as a custodian in this action (Wellschlager Decl. App. A at Line 12). Assuming that this email did in fact exist in Ms. Wahba's file at some point in time and was not produced, Plaintiffs have not shown that it was improperly destroyed or lost or that it existed in Ms. Wahba's files at the time the duty to

preserve attached. There is no basis for sanctions.

Next, Plaintiffs claim that the custodial productions from Dr. Verne Pitman, Dr. Stephen Sainati, Dr. Elizabeth Kitsis and Sharmila Parsotam are incomplete (Thomas Decl. ¶¶ 58–61). Plaintiffs have not demonstrated that sanctions are warranted based on these custodial productions.

■ Dr. Pitman was Pfizer's clinical liaison to the Searle clinical team conducting the 1999 Alzheimer's trial that found there was a statistically significant increased risk of cardiovascular events associated with Celebrex (Thomas Decl. ¶ 58; Ex. 86 at 30:9–12). Plaintiffs claim that summary data he had received from Searle has not been produced (Thomas Decl. Ex. 87 (email stating that Dr. Pitman had received "45 pages of summary data" that he had requested Searle to fax)). Plaintiffs next claim that Dr. Pitman's COX–2 files, which Dr. Pitman boxed up for a litigation and sent to archives (Thomas Decl. Ex. 86 at 58:15–59:18), have not been produced, even though "it seems logical that these documents (subject to a legal hold) could have been put into DLTS" (Thomas Decl. ¶ 58). Finally, Plaintiffs claim that Pfizer has produced "surprisingly few e-mails and other documents" related to the 1999 Alzheimer's trial (Thomas Decl. ¶ 58). Pfizer responds that it produced Dr. Pitman's custodial files. Pfizer further contends that it produced the custodial files of those involved in the study in question (Wellschlager Decl. Exs. 62–64) and that the relevancy of these documents is minimal because this study was not considered a key study by Pfizer (Wellschlager Decl. App. A at Line 51).

Again, Plaintiffs have not demonstrated the relevance of the allegedly spoliated documents related to Dr. Pitman and his involvement in the 1999 Alzheimer's trial. Even though Plaintiffs have not received the 45 pages of summary data, they have received other documents concerning this clinical trial. Moreover, Plaintiffs have not pointed to any other evidence that suggests that this missing data contained different or particularly

---

**11.** Plaintiffs discovered this document after a filing in the New Jersey securities action was unsealed.

relevant or critical information related to their claims. Finally, to the extent that Plaintiffs' assertion that "surprisingly few" documents were produced from Dr. Pitman and the 1999 Alzheimer's trial is meant to suggest that documents were spoliated, this assertion is speculative and an insufficient basis to justify the award of sanctions.

■ As to Dr. Sainati, Searle's medical monitor for the 1999 Alzheimer's trial, Plaintiffs claim that certain documents he created relating to this clinical trial "seem to have disappeared" (Thomas Decl. ¶ 60), including a document entitled "Alzheimer's Review—Development Committee Meeting 05/13/99—S. Sainati" (Thomas Decl. Ex. 11 at Wahba–M 10000030582) and a slideshow he presented at the Stockholm Symposium in 2000 that may have included the adverse event findings from the 1999 Alzheimer's trial (Thomas Decl. Ex. 92 at 356:5–16). Pfizer counters that it has produced documents related to the 1999 Alzheimer's clinical trial, including some of Dr. Sainati's files (Wellschlager Decl. App. A at Line 52).

Plaintiffs have not established the relevancy of the Sainati documents. Plaintiffs have not attempted to explain in what way the Development Committee Meeting document would have been favorable to them. Moreover, this document was referenced in a list of documents (Thomas Decl. Ex. 11) that, as explained below, were copied to either the GDMS and DLTS database; Pfizer has produced documents from both of these databases. As to the slide show, Dr. Sainati testified that "it would have been basically the same material" as other slide shows that were presented to management and were produced here (Thomas Decl. Ex. 82 at 357:13–18). Plaintiffs have provided no evidentiary basis from which to infer that this allegedly spoliated slide show contained any non-duplicative relevant material.

■ Plaintiffs also contend that Pfizer's production from Dr. Kitsis's files has been incomplete because she testified that her COX-2 email archives "disappeared" and then "reappeared within a day or two" and that this incident concerned her because it occurred when she had expressed concerns about the "risk benefit ratio" of Celebrex and

Bextra (Thomas Decl. Ex. 93 at 306:8–16; 306:21–307:7). This testimony, however, does not demonstrate that any of Dr. Kitsis's emails or other files are, in fact, missing. Although Dr. Kitsis did not confirm that her email archives were complete once they reappeared, Plaintiffs offer no evidence that any documents were missing and there is nothing in the record here from which to draw that inference. Moreover, Pfizer produced over 21,000 pages from Dr. Kitsis's files (Wellschlager Decl. Ex. 61) and Plaintiffs have not pointed to any other evidence that raises questions concerning the completeness of this production.

■ Plaintiffs claim the custodial production from Sharmila Parsotam, a former Pfizer regulatory director, was incomplete because some her emails were produced in the GDMS production, but not in her custodial production (Thomas Decl. ¶ 17; Thomas Supp. Decl. Ex. 1). Plaintiffs, however, have not elaborated on the relevance of these particular emails. Moreover, given that these emails were ultimately produced, it cannot be said that they were improperly lost or destroyed. There is no basis for sanctions.

Accordingly, Plaintiffs are not entitled to sanctions arising out of the alleged spoliated material from the custodial productions.

### e. Documents Missing from the eRooms and Centralized Databases Productions

Next, referring to a table of contents for the "COX-2 Portfolio Alliance Repository" (Thomas Decl. Ex. 11), Plaintiffs claim that certain documents that should have been found in Pfizer's production from the Infoshare/Insight database are missing, including (1) September 16, 1999 Development Committee Meeting Minutes and Slides; (2) Peter Isakson Phase IIIb Plan Presentation–Development Committee Meeting, January 28, 1999; (3) minutes folder containing minutes of the Celecoxib Project team in 1999; (4) folder of Celecoxib protocols from 1998–1999; and (4) folder of Valdecoxib protocols from 1998–1999 (Thomas Decl. ¶ 55). Plaintiffs further contend that Pfizer has failed to confirm that all relevant documents that

were transferred from older databases to the Infoshare/Insight database were preserved and that these documents were produced (Thomas Decl. ¶ 56).

■ Pfizer has produced an affidavit from Edward Gramling, its discovery counsel, in which he attested that this table of contents did not reflect a database that contained substantive information, but rather merely linked users to documents contained in an older database (Wellschlager Decl. Ex. 19 ¶¶ 3–4). Mr. Gramling further explained that the documents in that older database were transferred to either the GDMS or DLTS database (Wellschlager Decl. Ex. 19 ¶¶ 3, 11–12). In other words, these documents that Plaintiffs allege should have been found in Infoshare/Insight database would now be located in the GDMS or DLTS databases. Pfizer produced documents from both the GDMS and DLTS databases. Plaintiffs do not claim that these specific documents are not found in those productions, but only that Pfizer has failed to confirm their production and does not have server snapshots to verify what was preserved. In the absence of extrinsic evidence that otherwise demonstrates the potential loss of evidence, a party's failure to confirm production does not establish that the documents are missing or that the documents are relevant for the purpose of spoliation. There is no basis for sanctions based on the alleged non-production of these documents.

■ Plaintiffs also contend that the restored eRooms are missing specific documents that various other emails stated were placed in the eRooms, but which have not been found in the eRooms production (Thomas Decl. 152, Ex. 77–80). Pfizer claims that "it is likely that the referenced documents were part of Pfizer's earlier productions" (Wellschlager Decl. App. A at Line 47). With respect to the first three emails—a 2002 email discussing a study involving a COX–2 drug (Thomas Decl. Ex. 77) and two 2003 emails related to Celebrex (Thomas Decl. Exs. 78–78a)—Plaintiffs, again, have not provided any indication about the contents of these documents or how they would have been favorable to their claims. In addition, with respect to the latter two emails,

the documents to which they refer were uploaded to the eRooms by Eve Essing, who was a custodian in this case. Plaintiffs do not claim that Ms. Essing's custodial production has been incomplete. The final two emails date from 2005 and refer to documents that were uploaded to the COX–2 Regulatory Document Library eRoom (Thomas Decl. Ex. 79–80); Plaintiffs claim they have not been able any to find these documents in any of Pfizer's productions (Thomas Decl. 152). As with the other documents, Plaintiffs have not attempted to explain how these documents would have been favorable to them either through reference to pertinent deposition testimony or to other documents that were found in that same eRoom. *See DeEspana v. American Bureau of Shipping, supra,* 2007 WL 1686327, at *8 ("Typically, the evidence used to establish relevance of missing documents is deposition testimony."). Plaintiffs' bare assertion that these documents are missing is not sufficient to establish relevance.

■ Finally, with respect to a draft "Statistical Analysis Report" of a Celebrex study conducted in 2002, which noted that there was a statistically significant increased risk of adverse cardiovascular events associated with Celebrex (Thomas Decl. Ex. 52a at PFE SECURITIES GDMS 002131381), Plaintiffs claim the final version of this 2002 report, its patient narratives and any other documents indicating who may have reviewed the report's results have not been produced (Thomas Decl. ¶ 36; Pls.' Reply at 5). Plaintiffs argue that this report is relevant because it directly contradicts Pfizer's public statements that it had not seen a high rate of cardiovascular events related to Celebrex. Pfizer points out that an abstract of the report was produced to Plaintiffs in 2008 (Wellschlager Decl. App. A at Line 27; Ex. 56) and that this report is not relevant because it "specifically concluded that only two of the total nine cardiovascular events were considered 'related to the study drug' " (Wellschlager Decl. App. A at Line 27, Thomas Decl. Ex. 52a at PFE SECURITIES GDMS 002131224).

Plaintiffs are not entitled to sanctions based on Pfizer's failure to produce docu-

ments related to the 2002 report. Even assuming that these documents would weigh in Plaintiffs' favor, there is simply no prejudice to Plaintiffs. Plaintiffs do in fact have the draft report which contains a conclusion consistent with their position on the cardiovascular safety of Celebrex. In addition, Plaintiffs' characterization of this document as "yet another study (i.e., the Turkish study) showing increased CV risk for Celebrex" (Pls.' Reply at 7) implicitly concedes that the information contained in this document is consistent with the results of other studies that were produced.

In sum, Plaintiffs have failed to demonstrate the relevance of the spoliated evidence. Plaintiffs' motion for spoliation and other sanctions against Pfizer is therefore denied.

### C. *Plaintiffs' Motion: Delayed Production*

■ Finally, Plaintiffs claim that Pfizer's belated production of documents from the eRooms and the centralized databases justifies sanctions. I conclude that Plaintiffs are not entitled to sanctions because Plaintiffs have failed to show that Pfizer acted with the requisite culpability.

■ "When the nature of the breach [of discovery obligations] is non-production of evidence, as opposed to actual destruction or significant alteration, a district court 'has broad discretion in fashioning an appropriate sanction.'" *Pure Power Boot Camp v. Warrior Fitness Boot Camp,* 587 F.Supp.2d 548, 567 (S.D.N.Y.2008) (Koeltl, D.J.) (adopting Report & Recommendation of Katz, M.J.), *quoting Residential Funding Corp. v. DeGeorge Fin. Corp., supra,* 306 F.3d at 107. The test courts apply tracks the spoliation analysis: the moving party must establish "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp., supra,* 306 F.3d at 107. "[T]he harm

caused by delay in production is a relevant factor in determining sanctions, if a court determines that sanctions are warranted." *Pure Power Boot Camp v. Warrior Fitness Boot Camp, supra,* 587 F.Supp.2d at 567, *citing West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 780 (2d Cir.1999).

There is no dispute that Pfizer had an obligation to produce documents from the eRooms and the two centralized databases. The record, however, does not demonstrate that Pfizer acted with a culpable state of mind. Despite the fact that Pfizer did not begin to produce documents from these sources until near the close of discovery, once the existence of these repositories was called to counsel's attention, Pfizer acted in a timely manner. Pfizer agreed to forego an initial relevancy and privilege review to expedite the production. Pfizer also worked with Plaintiffs to locate and restore all the eRooms that Plaintiffs had identified. Moreover, these sources likely contained documents that were cumulative of earlier productions. Though Plaintiffs may have preferred to receive categorically organized productions earlier on in the discovery process, this does not change the fact that Pfizer did produce these documents. The ultimate production of these documents militates against the imposition of sanctions. *Convolve, Inc. v. Compaq Computer Corp., supra,* 223 F.R.D. at 169–70 (requiring the full disclosure of relevant documents, rather than sanctions, where party had delayed in producing documents); *Phoenix Four, Inc. v. Strategic Resources Corp., supra,* 2006 WL 1409413, at *7 (no adverse-inference instruction warranted where the party came forward with the evidence even though it was after the close of discovery).

■ Plaintiffs' claims of prejudice are largely conclusory. They argue that had the eRooms been produced earlier, they would have been able to make more informed decisions about their discovery strategy. They also claim they were prejudiced because they could not use the eRoom documents during the *Daubert* hearing, to question witnesses, or in their amended complaint. For example, Plaintiffs claim that draft minute meetings that were belatedly produced could have

been useful in deposing defendants McKinnell and Katen because they showed that these defendants likely reviewed clinical trial results of Celebrex and Bextra and that McKinnell knew about Pfizer's interest in an Alzheimer's indication (Thomas Decl. ¶ 15, Ex. 110). Pfizer, however, had previously produced a presentation from that same meeting, which was used at Katen's deposition (Wellschlager Decl. Ex. 45) and the final meeting minutes were produced to Plaintiffs in 2008 (Wellschlager Decl. App. A at Line 7). Therefore, any prejudice to Plaintiffs is minimal. In addition, Plaintiffs claim that they would not have had to send a document review team to a Michigan warehouse to review hard copies of files had they been aware earlier that documents were available in an electronic format (Thomas Decl. ¶ 16). There is, however, a distinction between lost usefulness and inconvenience, on the one hand, and prejudice, on the other hand. The examples Plaintiffs have cited do not demonstrate the sort of serious harm to the effective litigation of their case that sanctions are intended to remedy. Finally, whatever prejudice Plaintiffs may have suffered is mitigated by the fact that these productions came well before the trial date. *Cf. Residential Funding Corp. v. DeGeorge Fin. Corp., supra,* 306 F.3d at 112 (instructing district court on remand that moving party "could establish prejudice by pointing to specific e-mails that it would have used at trial; if so, the District Court could consider the likelihood that the newly produced e-mails would have affected the jury's verdict, in light of all the other evidence adduced at trial"); *L–3 Commc'ns Corp. v. OSI Sys., Inc.,* 02 Civ. 9144(PAC), 2006 WL 988143, at \*15 (S.D.N.Y. Apr. 13, 2006) (Crotty, D.J.) (moving party had not shown prejudice from untimely production of documents where rescheduling of trial date had afforded parties additional time to prepare with the belatedly produced documents). Plaintiffs' motion for sanctions against Pfizer based on the delayed production of documents is denied.

### D. *Pfizer's Motion for Sanctions*

Pfizer moves for sanctions on three different grounds: (1) against TRSL for its failure to preserve electronic documents; (2) against Plaintiffs for their failure to preserve material generated by two of their experts, Dr. Lawrence Baruch and Dr. Curt Furberg; and (3) against Plaintiffs for their use of statements by the Quoted Former Employees in the CCAC.

#### 1. *TRSL's Document Preservation*

Pfizer first seeks sanctions against TRSL because it failed to institute a litigation hold and did not suspend its routine document destruction. Pfizer contends that these failures resulted in the loss of relevant emails concerning TRSL's investment in Pfizer. Pfizer also claims that TRSL did not comply with a Louisiana state statute that requires the permanent retention of all documents related to its investment transactions. TRSL counters that its preservation polices were adequate to preserve whatever relevant documents existed.

Pfizer's motion for sanctions against TRSL is denied because it has failed to demonstrate the relevance of the spoliated evidence.

##### a. *TRSL's Duty to Preserve Electronic Documents*

TRSL's duty to preserve relevant evidence attached when it made the decision to bring this action against Pfizer. At that time, it did not institute a litigation hold and did not suspend its routine document destruction policies, including its one-year retention policy for emails. Because these failures led to the destruction of emails and other electronic information, TRSL breached its duty to preserve.

##### b. *TRSL's Culpability*

Pfizer argues that TRSL's failure to place a litigation hold amounts to gross negligence. However, based on the record here, I conclude that TRSL acted only negligently because its compliance with its existing preservation policies and Louisiana state law was adequate to preserve relevant evidence notwithstanding the absence of a formal litigation hold. Though other courts have found that a party has acted with gross negligence when it fails to institute a litigation hold, TRSL's situation presents several mitigating factors. *See Chin v. Port Auth. of N.Y. &*

*N.J., supra,* 685 F.3d at 162 (rejecting notion that failure to institute a litigation hold constitutes gross negligence *per se* and endorsing a case-by-case approach). Pursuant to Louisiana state law, TRSL is obligated to retain permanently all records of its stock transactions, and it has produced these records to Pfizer. Mr. Reeves, TRSL's Rule 30(b)(6) witness, testified that he could not say for certain that TRSL never had any email communications about Pfizer with it outside advisors, but he also testified that he would not have expected any such communications because TRSL's investment decisions were in the sole discretion of these advisors (Wang Decl. Ex 20 at 124:9–13). Mr. Griffith testified that TRSL's employees knew to preserve any documents related to Pfizer (Wang Decl. Ex. 33 at 49:7–22). This testimony, in conjunction with TRSL's statutory preservation obligations, indicates that TRSL's preservation policies reached the very sort of evidence relevant to a securities fraud action that a litigation hold would have covered. Importantly, TRSL's representatives testified that TRSL did not exercise any independent discretion over its investment decisions, but rather that these transactions were entirely in the discretion of its outside advisors. This suggests that TRSL never had any internal documents concerning the decision to invest in Pfizer. Thus, under these particular circumstances, TRSL's failure to institute a litigation hold does not rise to the level of gross negligence, but rather only negligence.

### c. *Relevancy of TRSL's Documents*

██ Finally, sanctions are not warranted because Pfizer has not established that any of the lost documents would have been relevant. Pfizer claims that the missing documents were relevant to TRSL's decision to invest in Pfizer and the issue of reliance. However, the evidence Pfizer has identified does not suggest that TRSL had any electronic documents that specifically referred to or discussed its decision to invest in Pfizer. First, Pfizer overstates the significance of deposition testimony from a TRSL employee that TRSL would occasionally discuss a specific investment with its outside investment advisors. This testimony was elicited in an unrelated case—the Tyco securities litigation—and there is no indication that TRSL's testimony in that case has any bearing on what communication it may have had with its investment advisors concerning Pfizer. Second, Pfizer argues that an email between TRSL and one of its investment advisors attaching information about a particular investment demonstrates that TRSL did communicate via email about specific investments and, therefore, there are missing emails related to Pfizer (Wang Decl. Ex. 35). The mere fact that TRSL had received information about other unrelated investments is insufficient, without more, to demonstrate that it must have also necessarily received information about its investment in Pfizer. Moreover, TRSL's Rule 30(b)(6) witness testified that TRSL likely sought this information in the email cited by Pfizer only after TRSL had already invested in that particular stock. Therefore, its receipt of the information after the investment was actually made sheds no light on TRSL's decision-making process leading to that investment. Third, the emails between TRSL and its outside advisors that related to the execution of certain trades of securities, including Pfizer, do not demonstrate that TRSL participated in the decision to invest in Pfizer. Rather, as explained by TRSL's Rule 30(b)(6) witness, these emails illustrate TRSL's role as a sort of middleman between its outside advisors and Louisiana brokers in an effort to comply with a then in-effect Louisiana law that required a certain percentage of trades be executed in Louisiana (La.Rev.Stat.Ann. § 11:266.1). The decision, however, whether to make these trades remained in the sole discretion of TRSL's outside advisors (Wang Decl. Ex. 20 at 64:4–5; Thomas Opp. Decl. Ex. G at 82:4–5, 11–15; Thomas Decl. Ex. 33 at 7:24–8:5). Finally, Pfizer argues that TRSL's potential receipt of a Goldman Sachs document that contained an analysis of Pfizer's stock indicates that there are other similar, relevant items that have been destroyed. However, Goldman Sachs is unable to confirm or deny that it sent this document to TRSL (Thomas Opp. Decl. Ex. T at 29 n. 9). Even assuming that it did, a document containing a general analysis of certain stocks, including Pfizer, does establish that TRSL

actually actively participated in investment decisions. At most, it demonstrates that Plaintiffs received general information about stocks in its portfolio, but not that it was actively engaged in the decision to buy or sell specific securities.

Even considering these documents in the aggregate, they do not suggest that TRSL discussed its investment strategy concerning Pfizer (or any other stock) with its advisors through email and, therefore, these documents have no bearing on TRSL's reliance. Accordingly, the absence of documents has not created "an unfair evidentiary imbalance." *Richard Green (Fine Paintings) v. McClendon, supra,* 262 F.R.D. at 291 (adverse inference not appropriate "without some proof that the defendant's actions created an unfair evidentiary imbalance"); *see also Centrifugal Force, Inc. v. Softnet Commc'n, Inc., supra,* 783 F.Supp.2d at 750 (in a copyright infringement action, plaintiff was not entitled to sanctions where it did not demonstrate that missing evidence "would have allowed it to show infringement in a way that is at all materially different from the proof already available to it"). Moreover, TRSL has consistently represented throughout the course of discovery that it did not have any discretion over its investment decisions because these decisions were made independently by its outside advisors (Wang Decl. Ex. 20 at 64:4–5; Thomas Opp. Decl. Ex. G at 82:4–5, 11–15; Thomas Decl. Ex. 33 at 7:24–8:5). Accordingly, there simply are no relevant electronic documents to preserve or produce. There is no basis to sanction a party for non-production or spoliation when those documents never existed in the first instance. *See Zervos v. S.S. Sam Houston,* 79 F.R.D. 593, 595 (S.D.N.Y.1978) (Werker, D.J.) ("Under ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody or control, should resolve the issue of failure of production."); *see also Nycomed U.S. Inc. v. Glenmark Generics Ltd.,* 08 Civ. 5023(CBA), 2009 WL 3463912, at *2 (E.D.N.Y. Oct. 21, 2009); *Atwell v. City of New York,* 07 Civ. 2365 (WHP), 2008 WL 5336690, at *1 (S.D.N.Y. Dec. 15, 2008) (Pauley, D.J.). Pfizer's motion for sanctions against TRSL for failure to preserve electronic documents is denied.

### 2. *Expert Material*

■ Pfizer next contends that I should impose sanctions against Plaintiffs because they failed to preserve the documents created and used by their experts Dr. Lawrence Baruch and Dr. Curt Furberg in classifying deaths from Pfizer's clinical trials. With respect to Dr. Baruch, Pfizer claims that the adverse event files Dr. Baruch requested in connection with his classifications and any files he created have been lost or destroyed. With respect to Dr. Furberg, Pfizer claims that his handwritten revisions to Dr. Baruch's classification spreadsheet have been lost. Pfizer argues that because Dr. Madigan's statistical analysis relied on the classification work performed by Dr. Baruch and Dr. Furberg, Plaintiffs should have produced these documents. Plaintiffs respond that Dr. Madigan ended up relying on Pfizer's own classifications and his reliance on Dr. Furberg's and Dr. Baruch's classifications was ultimately limited to one category and four additional deaths.

The critical issue here is whether Plaintiffs had a duty to preserve this material under the parties' protective order regarding expert discovery. This protective order provided, in pertinent part, that the parties were required to produce only those documents "on which the expert has relied as a basis for his or her opinion" (Wang Decl. Ex. 53 at ¶ 4(c)). Here, Dr. Madigan's testimony demonstrates that he relied only on the final product of Dr. Baruch's and Dr. Furberg's classifications, *i.e.,* the final version of the classification spreadsheet (Shilling Decl. Ex. 58 at 148:14–21). Dr. Madigan did testify that the classification work performed by Dr. Baruch and Dr. Furberg was important to his analysis, but that testimony addressed their final conclusions—not the process by which they reached those conclusions. In other words, it was the final product of Dr. Baruch's and Dr. Furberg's work that mattered to Dr. Madigan, not all the steps leading up it. The fact that Pfizer questions whether the classification process was sound is a separate matter from whether Dr. Madi-

gan relied on that process in reaching his opinion.

Moreover, an entire portion of Dr. Madigan's analysis was updated to reflect classifications that had been performed by Pfizer itself. As a result, Dr. Madigan testified that his analysis relied on Dr. Furberg's and Dr. Baruch's classifications only with respect to one category and four additional deaths. With respect to these deaths, Dr. Madigan similarly did not testify that his opinion turned on the process by which either Dr. Furberg or Dr. Baruch reached their classifications.

■ Pfizer has also failed to demonstrate prejudice. Pfizer claims that the spoliation of these materials has prevented it from replicating the classification work of Dr. Baruch and Dr. Furberg and adequately testing the reliability of Dr. Madigan's analysis. However, Pfizer does have the raw clinical trial data underlying the work of all three experts, as well as Dr. Baruch's and Dr. Furberg's final classification conclusions. Indeed, Pfizer completed its own meta-analysis of the adverse events that were reported in its clinical trial data. In addition, Pfizer also has the classification work initially performed by Dr. Baruch in 2008 (Wang Decl. Ex. 7 at 391:20–392:14; Thomas Opp. Decl. ¶ 2). Pfizer cannot claim prejudice when it has all the materials available to it to recreate the work performed by Plaintiffs' experts.

Finally, the fact that Dr. Madigan relied on Dr. Baruch's and Dr. Furberg's classifications does not alter my conclusion. Again, he relied only on their final classifications and the documents reflecting those classifications were produced.

Accordingly, having failed to show that Dr. Madigan relied on any of the spoliated material from either Dr. Furberg or Dr. Baruch, Pfizer's motion to exclude the testimony of Dr. Madigan, Dr. Furberg and Dr. Baruch and its motion for sanctions against Plaintiffs arising out of the spoliation of this expert material are, therefore, denied.[12]

### 3. Statements of Quoted Former Employees Included in the CCAC

Pfizer next argues that I should award sanctions pursuant to my inherent powers because Plaintiffs used the statements of the Quoted Former Employees in a misleading manner in the CCAC. Plaintiffs respond that (1) sanctions pursuant to the court's inherent power are inappropriate because Rule 11 of the Federal Rules of Civil Procedure applies and (2) in any event, sanctions are not warranted because Plaintiffs' use of the Quoted Former Employees was proper.

#### a. Applicable Law

■ Pursuant to its inherent power, a court may impose sanctions "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), *quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The Supreme Court, however, has counseled that "when there is a bad-faith conduct in the course of litigation that could be adequately sanctioned under the [Federal Rules of Civil Procedure], the court ordinarily should rely on the Rules rather than the inherent power." *Chambers v. NASCO, Inc.*, *supra*, 501 U.S. at 50, 111 S.Ct. 2123. Nonetheless, if a court determines in its discretion that the applicable Rule is not adequate to sanction the conduct, it may rely on its inherent powers. *Chambers v. NASCO, Inc.*, *supra*, 501 U.S. at 50, 111 S.Ct. 2123.

Rule 11 of the Federal Rules of Civil Procedure permits a court to impose sanctions for violations of Rule 11(b). Fed.R.Civ.P. 11(c)(1); *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir.2004). Rule 11(b) provides, in pertinent part, that "[b]y presenting to the court a pleading ... whether by signing, filing, submitting, or later advocating it ... an attorney ... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances the factual contentions

---

12. Pfizer also claims that portions of the expert reports and testimony of Dr. Blume, Dr. Helfgott, Dr. Jewell and Dr. Zipes relied on Dr. Madigan's work, and therefore should also be excluded (*see*

Docket Item 423, Memorandum of Law in Support of Defendants' Motion for Sanctions ("Pfizer Mem.") at 6, 16–17). For the reasons explained in the text above, this motion is also denied.

have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R.Civ.P. 11(b)(3). In securities fraud actions, "[u]pon final adjudication ..., the [Private Securities Litigation Reform Act] requires the court to make findings regarding each attorney's compliance with Rule 11(b)." *Weinraub v. Glen Rauch Sec. Inc.*, 419 F.Supp.2d 507, 512 (S.D.N.Y.2005) (Scheindlin, D.J.); *see* 15 U.S.C. § 78u–4(c)(1) ("In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion."). The PSLRA does not alter the standards applicable to assessing whether Rule 11(b) has been violated, but instead makes review for Rule 11 violations mandatory rather than discretionary and creates presumptions regarding sanctions. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir.2009); *de la Fuente v. DCI Telecommc'ns, Inc.*, 259 F.Supp.2d 250, 256 (S.D.N.Y.2003) (McMahon, D.J.).

#### b. *Analysis*

■ Here, Pfizer's motion for sanctions based on the inclusion of the Quoted Former Employees' statements in the CCAC is more properly addressed through a Rule 11 motion after the final adjudication of this action. The crux of Pfizer's claim is that the inferences Plaintiffs drew from these statements in support of their scienter allegations "lacked any factual basis" (Pfizer Mem. at 24–25) because each of the Quoted Former Employees all maintained that he or she never believed that anyone at Pfizer or Pharmacia engaged in any wrongdoing with respect to the safety of Celebrex and Bextra and was never aware of any evidence of such wrongdoing (Pfizer Mem. at 25; Wang Decl. Exs. 49–50). In other words, Pfizer has alleged that Plaintiffs' factual contentions in the CCAC did not have evidentiary support. This is the very sort of claim that Rule 11 is intended to address. *See* Fed.R.Civ.P.

11(b)(3); *Richtone Design Grp., L.L.C. v. Classical Pilates, Inc.*, 06 Civ. 0547(NRB), 2007 WL 1098706, at *3 n. 1 (S.D.N.Y. Apr. 10, 2007) (Buchwald, D.J.) ("[T]he invocation of this Court's inherent powers in situation such as this, where the moving party might have availed itself of Rule 11, would have the unwanted and undesirable 'effect of rendering Rule 11's separate motion and safe harbor provisions meaningless,'" *quoting Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1059 (7th Cir.1998)). Moreover, Pfizer is assured of a Rule 11 review because the PSLRA makes such a review mandatory in securities fraud actions. *See* 15 U.S.C. § 78u–4(c)(1). Thus, any prejudice from my decision not to exercise my inherent power at this point in time to consider whether Plaintiffs should be sanctioned is minimized. To the extent that Pfizer moves for sanctions because Plaintiffs' investigator did not disclose that it was working for a party suing Pfizer when eliciting statements from the Quoted Former Employees, this conduct can also be addressed by Rule 11. The context in which the statements were given can color the analysis of whether Plaintiffs were objectively unreasonable in drawing the inferences that they did.

■ Moreover, the fact that the Quoted Former Employees disagree with the inferences Plaintiffs' counsel draws from their statements does not necessarily imply that Rule 11 has been violated. Part of the job of an advocate is to argue to the fact finder that all the evidence, taken together, leads to the inference most favorable to the advocate's client. The fact that some percipient witnesses disagree with the ultimate conclusion drawn by the advocate does not ineluctably demonstrate that the conclusion is baseless or even incorrect. As the preceding sections of this opinion demonstrate, millions of documents have been produced in this action and numerous depositions conducted. There can be no question that the Quoted Former Employees have not had access to this discovery and have not seen the same array of information to which Plaintiffs' counsel has had access. The fact that the Quoted Former Em-

ployees draw different inferences, based on a less complete array of information, than Plaintiffs' counsel does provides no reliable basis for concluding whose inferences are correct. Thus, even if I were to consider the merits of this aspect of Pfizer's application, there would be no basis for concluding at this point in time that Rule 11 has been violated.

Finally, a pre-trial motion for sanctions is not the appropriate vehicle to test the truth or falsity of allegations in a complaint. Pfizer's claim is that Plaintiffs misrepresented the Quoted Former Employees in such manner that their allegations lacked any factual basis. If I were to accept this claim and sanction Plaintiffs, it would be tantamount to discrediting the truth of these allegations. Such a finding, if warranted, is and should remain in the discretion of the fact finder. A motion for sanctions cannot serve as an end-run around the fact finder's exclusive role to resolve factual disputes.

Accordingly, Pfizer's motion for sanctions based on the statements of the Quoted Former Employees included in the CCAC is denied without prejudice to renewal pursuant to Rule 11 after the final adjudication of this action.

## IV. *Conclusion*

For the foregoing reasons, Plaintiffs' motion for sanctions is denied in its entirety (Docket Item 425), and Pfizer's motion for sanctions (Docket Item 422) is denied in its entirety.

SO ORDERED.